# LOUIS WILLIAM IRVIN *v.* STATE OF MARYLAND

[No. 140, September Term, 1974.]

*Decided November 19, 1974.*

458

The cause was argued before THOMPSON, POWERS and GILBERT, JJ.

*William F. Mosner* for appellant.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *H. Edgar Lentz, Assistant Attorney General,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

This appeal has arisen as a result of a directive dated

November 13, 1972 from Governor Marvin Mandel[1] to Attorney General Francis B. Burch in which the Attorney General was directed to conduct an investigation into "the allegations of corruption of public officials in connection with the arrest, pending prosecution and escape of one, John Edward Jones, from the Baltimore County jail, and to pursue any evidence of criminal violations or administrative irregularities resulting from your investigation."

During the course of the Attorney General's inquiry the then Deputy State's Attorney for Baltimore County, Stuart L. Hirsch, furnished the Attorney General's representatives and the Maryland State Police with "150 hours of tapes" concerning the operation of the Baltimore County State's Attorney's office. As a result of information supplied by Hirsch, an investigation focused upon what became known as "the Harrington case". That case involved Kneass Harrington's efforts to have a *nol prossed* indictment that charged violation of the gambling laws expunged from government records. In order to accomplish his desire, Harrington contacted the appellant, Louis William Irvin, the chief investigator for the State's Attorney's office of Baltimore County. Irvin in turn talked to Hirsch, and, as a result of that conversation, Irvin delivered to Harrington a "Petition to Expunge", which petition was drawn by Hirsch, but signed by another member of the bar, Stephen Luskin Miles, at Hirsch's request. Irvin collected a "fee" of $750.00 from Harrington, all or part of which was turned over to Hirsch. An order on the petition was signed as a routine matter by a judge of the Circuit Court for Baltimore County on July 13, 1972.

A Baltimore County police lieutenant, who was a friend of Harrington, noted that the records of the County police had

---

1. The directive was issued pursuant to Art. 5, § 3 of the Constitution of Maryland. That section provides in pertinent part:

"It shall be the duty of the Attorney General . . . [to] commence and prosecute or defend any suit or action in any of said Courts, on the part of the State, which . . . the Governor, acting according to law, shall direct to be commenced, prosecuted or defended. . . ."

not been expunged, and the lieutenant made a complaint to Hirsch. Hirsch then wrote a letter to the County police in which he enclosed an attested copy of the order of expungement. In compliance with the order the Baltimore County police and the Maryland State police removed all records pertaining to Harrington's arrest on the gambling violation. No expungement, however, was effected in the office of the Clerk of the Court of Baltimore County nor, apparently, in the office of the Federal Bureau of Investigation.

Irvin was indicted by the grand jury for Baltimore County in Indictment No. 46738 charging false pretense, bribery, extortion and misconduct in office. He was also indicted in Indictment No. 46739, a five count indictment charging obstruction of justice and misconduct in office, and in Indictment No. 46882 charging conspiracy to obstruct justice. Irvin moved to dismiss the indictments on the ground that they were procedurally defective. After a pretrial hearing Judge Robert E. Clapp, Jr. dismissed counts three and four of Indictment No. 46738, all counts of Indictment No. 46739 and Indictment No. 46882. The State *nol prossed* counts one and two of Indictment No. 46738.

On October 9, 1973 the State appealed the trial court's dismissal of Indictments Nos. 46739 and 46882. Thereafter, on October 11, 1973, while the appeal was pending, the State sought and obtained a new indictment against Irvin containing twelve counts.[2] The case commenced on October 31 and terminated on November 6, 1973. Irvin was found guilty of false pretense and two counts of conspiracy. Following trial Irvin filed a "Motion for a New Trial" in which, *inter alia,* he suggested that the trial court lacked jurisdiction because of the pending appeal. His motion was denied and he received concurrent eighteen month sentences. The State then dismissed its appeal dated October 9, 1973.

---

**2.** The indictment charged false pretense, bribery, four counts of obstruction of justice in violation of Md. Ann. Code art. 27, § 27, three counts of common law obstruction of justice and three counts of conspiracy.

In this Court Irvin contends:

I. "After the State entered an appeal from the dismissal of certain counts in the original indictment[s] and then reindicted appellant on the same charges it could not proceed to trial on the latter indictment while the appeal on the first was still pending."

II. The evidence was insufficient to sustain a conviction of false pretense.

III. The evidence was insufficient to sustain a conviction of conspiracy.

IV. The trial judge erred in admitting statements of an alleged coconspirator into evidence.

I.

Md. Ann. Code, Cts. & Jud. Proc. Art., § 12-302 c (1974) provides:

"In a criminal case, the state may appeal only from a final judgment granting a motion to dismiss or quashing or dismissing any indictment, information, presentment, or inquisition in a criminal case." [3]

Even in the absence of legislative authority the Court of Appeals has long held that the State could appeal a dismissal of an indictment. In *State v. Buchanan*, 5 Harr. & J. 317, 9 Am. Dec. 534 (1821), it is stated:

" . . . [T]here is no sufficient reason why the state should not be entitled to a writ of error in a criminal case. It is perhaps a right that should be seldom exercised, and never for the purpose of oppression, or without necessity; which can rarely, and it is supposed would never happen, and would not be tolerated by public feeling. But as the state

---

**3.** At the time of trial in the instant case, the matter was governed by Md. Ann. Code art. 5, § 14. The changes effected by the adoption of Courts Art. 12-302, effective January 1, 1974, are stylistic only.

has no interest in the punishment of an offender, except for the purpose of general justice connected with the public welfare, no such abuse is to be apprehended; . . ."

The Court, in *State v. Wade*, 55 Md. 39 (1880), addressed itself to the finality of a dismissal of an indictment. It said:

" . . . The record shows that the indictment was quashed by the court below upon the motion of the defendant. That was a final termination of the prosecution upon the *particular* indictment, and the defendant was necessarily discharged from all further proceedings thereon. *Whether the State may proceed on another indictment would depend upon the action of a future grand jury.*" (Emphasis supplied).

The Court also held in *State v. Hodges*, 55 Md. 127 (1880) that:

" . . . [T]he judgment in quashing an indictment is a final judgment. There can be no further proceedings upon *the* indictment, and although the prisoner may be held to bail to await the further action of the grand jury, yet so far as the pending indictment is concerned, he is entitled to his discharge." (Emphasis supplied).

More recently, this Court in *Raimondi v. State*, 8 Md. App. 468, 261 A. 2d 40 (1970), speaking through Chief Judge Murphy, opined at 475:

"The Court of Appeals has held that the perfecting of an appeal brings the subject matter thereof within the exclusive jurisdiction of the appellate court and suspends the authority of the lower court over it during the pendency of the appeal; that the lower court lacks jurisdiction to take any further action *in the case* with respect to the subject matter of the appeal until the receipt of the mandate of the appellate court, after the appeal has been heard and decided." (Emphasis supplied).

Appellant argues that the effect of *Raimondi* is that "if an appeal is filed from what is considered to be a final order — such as an order dismissing indictments — the lower court does lose jurisdiction to proceed further until the appeal has been heard."

As we read *Raimondi* in the light of *Wade* and *Hodges*, *supra*, when the State appeals the dismissal of an indictment, the trial court loses jurisdiction over *that particular indictment*. It does not, however, lose the jurisdiction to try the accused on a subsequent indictment even though the subsequent indictment arises from the same facts. When Chief Judge Murphy, in *Raimondi*, referred to the fact that the trial court lacked "jurisdiction to take any further action *in the case* with respect to the subject matter of the appeal" (Emphasis supplied), he obviously was referring to *the particular indictment* upon which the appeal was pending.[4]

Although the appellant has referred us to a number of cases arising in other jurisdictions,[5] we do not find them persuasive because the law of Maryland, since *Wade* and *Hodges*, *supra*, is to the contrary.[6] In Maryland the State may either appeal the dismissal of an indictment or seek a new indictment or both so long as the State's action is not deemed to be oppressive and thus a possible violation of due process of law. In sum, the State must act in good faith.

---

4. *Cf.* Blondes v. State, 19 Md. App. 714, 314 A. 2d 746 (1974), *cert. granted* by the Court of Appeals May 9, 1974, and not decided as of the date this opinion was filed.

5. People v. Bogart, 7 Cal.App.3d 257, 86 Cal. Rptr. 737 (1970); Anderson v. Superior Court, 66 Cal. 2d 863, 59 Cal. Rptr. 426, 428 P. 2d 290 (1967); People v. Owens, 71 Cal.App.2d 831, 164 P. 2d 28 (1945); State v. Olson, 259 Iowa 756, 145 N.W.2d 645 (1966); State v. Jackson, 228 Or. 371, 365 P. 2d 294 (1961). We note that in the case of People v. Bogart, *supra*, relied upon by appellant, the California Court of Appeal, Second District, Division 2 stated, "The People have a right to have the sufficiency of the indictment tested in an appellate court by appeal which in no way is in conflict with the trial of other charges contained in the indictment. . . . The trial court was not deprived of jurisdiction to try those counts which were not on appeal."

6. The Maryland view is supported in other states. *See, e.g.,* State v. Ashworth, 346 Mo. 869, 143 S.W.2d 279 (1940) where the Supreme Court of Missouri declared that the "pendency of the case in this court . . . operated to divest the trial court of jurisdiction. . ." but went on to state that "[t]his rule is subject to the qualification that the divesture goes only to matters necessarily involved in the review proceedings."

We hold that the Circuit Court for Baltimore County was not divested of jurisdiction to try the appellant on a new indictment notwithstanding the State's appeal from a dismissal of prior indictments arising out of the same facts.

## II.

We turn now to appellant's second contention. Md. Ann. Code art. 27, § 140 provides in pertinent part:

> "Any person who shall by any false pretense obtain from any other person any chattel, money or valuable security, with intent to defraud any person of the same, shall be guilty of a misdemeanor, and being convicted thereof shall be liable, at the discretion of the court, to be punished by fine and imprisonment, or by confinement in the penitentiary for not less than two years nor more than ten years, as the court shall award; provided always, that if upon the trial of any person charged with such misdemeanor it shall be proved that he obtained the property in question in any such manner as to amount in law to larceny or robbery, he shall not by reason thereof be entitled to be acquitted of such misdemeanor; and no person tried upon such misdemeanor shall be afterwards liable for larceny or robbery upon the same facts; and provided also, that a mere promise for future payment, though not intended to be performed, shall not be sufficient to authorize a conviction under this section."

This Court, in *Polisher v. State*, 11 Md. App. 555, 276 A. 2d 102 (1971), *cert. denied* 262 Md. 749 (1971), *cert. denied* 404 U. S. 984, 92 S. Ct. 449, 30 L.Ed.2d 368 (1971), set forth the elements of the crime of false pretense. We said:

" . . . [T]he crime is committed when a person:

1) by making a false representation of a past or existing fact;

2) with intent to defraud; and

3) knowledge of its falsity;

4) obtains any chattel, money or valuable security from another;

5) who relies on the false representation;

6) to his detriment."

Harrington testified that the appellant advised him to write a letter to the State's Attorney requesting expungement of Harrington's record. He did so and thereafter appellant came to see him. At that time appellant told Harrington that appellant had talked the matter over with the State's Attorney, and the State's Attorney had "suggested that it would cost me $750.00 to have an expungement of (sic) legal fees done for this problem and [appellant] suggested that he would stop by and pick up the fee." Harrington stated that appellant again visited him and gave him three papers to read from Stephen Miles, in State v. Kneass Harrington. Harrington "signed the paper at the bottom". Harrington related to the court that he had a conversation with Irvin about Miles and that Irvin told him "Miles was at one time a Clerk of the Court and that this is who he had gotten to help my matter — in my matter." Harrington believed that the money was going to be turned over to Miles as a legal fee for expunging Harrington's criminal record. After a police lieutenant, who was a friend of Harrington, discovered that the record had not been expunged in the Baltimore County police headquarters, the lieutenant met with Irvin and Stuart Hirsch. The officer complained that Miles had not had the record expunged despite the fact that Miles had been paid $750.00. The lieutenant asked if Miles had in fact been paid the money, and Irvin replied, "Certainly." The lieutenant then threatened that if the matter were not cleared up within ninety days, he would go to the Bar Association. Hirsch told him to "calm down" and that he, Hirsch, would "take care of it and we will get back to your Mr. Harrington." Harrington subsequently received a letter, on the stationery of the State's Attorney's office, signed by Stuart Hirsch as Deputy

State's Attorney and, it indicated that Harrington's record had, in fact, been expunged.

The gist of the appellant's argument, that the testimony does not support a conviction for false pretense, is that there was no intent by Irvin to defraud Harrington, and that Harrington received that for which he paid, *videlicet*, an expungement of the records. Appellant strenuously argues that this case lacks the "feel" of false pretense, but we do not share that lack of feeling.

Judge Clapp determined from the evidence that Hirsch and Irvin discussed the situation and that Hirsch advised Irvin "that there would be a payment required of $750.00 to get the record expunged." The judge found:

"... [W]hen Mr. Irvin returned from vacation on July the 17th, 1972, he and Mr. Hirsch discussed this matter and Mr. Hirsch advised Mr. Irvin that it had been signed and everything was taken care of and to go and get [the] money. ... Mr. Irvin called Mr. Harrington, told him what the fee would be and Mr. Harrington ... had the money ready when Mr. Irvin arrived. I think Mr. Irvin knew that Stephen Miles had signed this petition, although Mr. Irvin denied that he ever knew about it until much later in 1973, but in any event, I think Mr. Irvin did tell Mr. Harrington at the time that Mr. Miles was the attorney that he had gotten to put this matter through because Mr. Miles had this prior experience of a clerk, whether it was in the State's Attorney's office or Clerk of the Court, I can't really tell from the evidence and it really doesn't matter.

Now, I find that Mr. Harrington ... [relied] ... on this representation and on the representation that this paper would accomplish what he desired, the expungement of the records in Baltimore County and with the F.B.I., and he paid the money to Mr. Irvin.

I find further as a fact that Mr. Irvin and Mr.

Hirsch each received all or a part of this money; I can't tell which. I find further as a fact that they each knew that this was not a fee to go to Stephen Miles. I find further as a fact that later on in the summer Detective Scott discussed with Mr. Irvin why nothing had been done although a fee had been paid and Mr. Irvin said, *we* are working on it." (Emphasis supplied).

In a non-jury trial the credibility of the witnesses and the weight of the evidence is a matter for the trial judge to determine, and his findings will only be disturbed on appeal where they are found to be clearly erroneous. Md. Rule 1086. Applying the elements of *Polisher v. State, supra,* to the instant case, we conclude that Judge Clapp was not clearly erroneous, and that the testimony adduced by the State was sufficient to support a finding of guilt of false pretense.

### III.

Irvin makes a two-pronged attack on his convictions for conspiracy to obstruct justice. First, he denies that the alleged conspiratorial meetings of January 12, 1973 and January 23, 1973 occurred. Second, he charges that the record is devoid of corroboration of the testimony of the coconspirator, Hirsch. We need not discuss the first prong of appellant's contention because it involves a question of adjudging the credibility of the witnesses which is a matter for the trial court. Md. Rule 1086. The second prong, however, requires discussion. We said in *Price v. State,* 4 Md. App. 701, 244 A. 2d 900 (1968):

"In Maryland, as generally, the gist of a conspiracy is the entering into of the illegal scheme or design, and once this occurs, the crime is complete without the doing of an overt act. *Greenwald v. State,* 221 Md. 235 [155 A. 2d 894 (1959)]. The testimony of an accomplice is clearly admissible to prove a conspiracy, *Foster v. State,* 230 Md. 256 [186 A. 2d 619 (1962)], and the conspiracy may also be shown by circumstantial

> evidence from which an inference of common design may be drawn, it not being vital to demonstrate that the conspirators met and agreed in terms to a set design and to pursue it by common means. See *Hill v. State*, 231 Md. 458 [190 A. 2d 795 (1963)]; *Seidman v. State*, 230 Md. 305 [187 A. 2d 109 (1962)]."

The testimony of a coconspirator must, of course, be corroborated, but the corroboration need be slight. *Mason v. State*, 18 Md. App. 130, 305 A. 2d 492 (1973), *cert. denied*, September 10, 1973. *Montgomery v. State*, 17 Md. App. 119, 300 A. 2d 218 (1973); *Early v. State*, 13 Md. App. 182, 282 A. 2d 154 (1971); *Foxwell v. State*, 13 Md. App. 37, 281 A. 2d 123 (1971); *Spies v. State*, 8 Md. App. 160, 258 A. 2d 758 (1969); *Boone v. State*, 3 Md. App. 11, 237 A. 2d 787 (1968), *cert. denied* 393 U. S. 872, 89 S. Ct. 161, 21 L.Ed.2d 141 (1968); *Bright v. State*, 1 Md. App. 557, 232 A. 2d 544 (1967). We explained in *Early v. State, supra*, that corroborative evidence was that evidence that strengthened the "probative, criminating force" of the accomplice's testimony and "not necessarily the proof of any particular fact." Such corroborative testimony must, however, "(1) identify the defendant with the perpetrators of the crime, or (2) . . . show the defendant's participation in the crime itself." *Early v. State, supra. See also Spies v. State, supra; Boone v. State, supra; Bright v. State, supra.*

A reading of the record in the instant case discloses that the testimony concerning the appellant's own acts and admissions furnished both direct and circumstantial evidence of the existence of the conspiracy and thus corroborated Hirsch's testimony.

We summarize those acts and admissions: Irvin acknowledged that on February 8, 1973, he met with State's Attorney Samuel Green, Hirsch and Miles. At that time Miles was asked to "open up a file in the Harrington matter", and Irvin was asked to return the money to Harrington. Irvin did return the $750.00 to Harrington on February 12, 1973. The return of the money was secretly

witnessed by the State police. Harrington said that when the money was returned Irvin stated, *"We* feel that *we* shouldn't have charged you for expunging of your record." (Emphasis supplied). The next day Irvin gave˙false and contradictory statements to the State police. He told the police that the $750.00 was a fee for Hirsch's father who is a member of the bar and who was the person who handled the expungement. He said "I turned it [the $750.00] over to Mr. [Stuart] Hirsch to be given to his father and that's the extent of it." Stuart Hirsch had testified, in essence, that the idea of having Hirsch's father open a file in the Harrington case had arisen after the Attorney General began his inquiry into the operation of the Baltimore County State's Attorney's office. Irvin denied that he had ever seen Miles's name and signature upon the "Petition for Expungement". Hirsch's father told the court that he had never opened a file on the Harrington case, and that he knew nothing about it. Without recounting all of the various misrepresentations made by Irvin to the State police, suffice it to say that Irvin's representations to the State police were to the effect that the attorney who handled the case for Harrington was Hirsch's father. This misrepresentation bolstered Stuart Hirsch's testimony concerning the "cover up" scheme that was apparently concocted after Miles refused to open a file and indicate that he had received the fee. At the trial Irvin sought to explain away the false statements on the ground that at the time he made them, he was nervous, upset and could not remember. Mrs. Frances Fuhr, described as a friend of Hirsch, told Judge Clapp that Irvin said to her that he had lied to the State police about the Harrington case.

We think Irvin's testimony, in and of itself, furnished sufficient corroboration of the evidence presented by Hirsch that at least Hirsch and Irvin conspired to obstruct justice by concealing the "Harrington case" transactions.

## IV.

The indictment charged in the sixth count that, between January 11, 1973 and June 15, 1973, Irvin "did unlawfully conspire with Samuel A. Green, Jr. and Stuart Hirsch to

violate the obstruction of justice laws of the State of Maryland", and in the eighth count averred that during the same period of time, Irvin "unlawfully conspired, confederated and agreed with . . . Green and . . . Hirsch to suppress and to conceal information and evidence from and to convey certain misleading and false reports, information and testimony to officers of the Maryland State police and to the Attorney General of Maryland. . . ." [7]

At the trial the State introduced three statements in support of its allegations of conspiracy. The first of those statements was the testimony of Hirsch that in July, 1972, he was instructed by Green, after having advised Green that it was improper for a member of the State's Attorney's office to draw up a petition to expunge, to "get someone to do it for you". Hirsch then prevailed upon Miles to sign the petition. Appellant argues that the testimony by Hirsch was inadmissible in that Irvin was not present, it occurred prior to the date of commencement of the conspiracy as charged in the indictment, and that it was hearsay. We think this evidence to have been admissible to show the motive or intent for the subsequent "cover up". *Greenwald v. State*, 221 Md. 245, 249, 157 A. 2d 119 (1960).

In *Greenwald, supra*, Judge Hammond (later Chief Judge) stated at 249 that prior acts and declarations of a coconspirator are admissible in evidence if the prior acts "tend to show motive, intent, a common scheme or design, absence of mistake or accident, or identity," provided that "such a showing has relevance in establishing a principal fact at issue or matter in dispute." " . . . [T]his general rule", Judge Hammond said, "is applicable in cases of conspiracy." *See also Bloomer v. State*, 48 Md. 521 (1878).

The second statement was a police transcription of a telephone call made by Green to Hirsch. The police, by prearrangement with Hirsch, listened to the conversation on an extension phone. The gist of that call was that Green asked Hirsch if his, Hirsch's, father had opened up a file on

---

7. Whether this count charges a crime is not before us.

the Harrington matter. Appellant argues that, inasmuch as Hirsch was cooperating with the police, the conspiracy was terminated, and hence the statement could not be admitted. We disagree.

In 3 Underhill *Criminal Evidence* § 861, at 1930-1931 (5th ed. 1957) it is stated:

> " . . . [B]efore the declarations of one conspirator are admissible against a coconspirator the existence of the conspiracy and the connection of the coconspirator therewith must be established. This is true where the declarations of the conspirator are sought to be introduced through a third person; such third person cannot testify against the coconspirator until the latter's connection with the conspiracy is proved by evidence aliunde. But the proposition is not true when the witness is a conspirator who seeks to testify about declarations made to him by his coconspirator. In such case the witness may testify and the testimony will be received against the coconspirator. The analogy here is to the law of agency: the testimony of a third person as to what an alleged agent told him will not be received against the principal unless the agency is first established, but the agent himself may always testify to relevant statements made to him by the principal.
>
> Further, the declarations of one conspirator are admissible against a coconspirator when forming part of a conversation between them, and the acts of one are admissible against the other when done in the latter's presence and on the occasion of the alleged offense." (Footnotes omitted).

*See also Mason v. State, supra,* where the rule of the admissibility of statements made by a coconspirator is summarized at 136-137:

> " . . . [T]he rule is that when the State seeks to

> use statements against a co-conspirator made by another co-conspirator to a third party, it must first demonstrate, through evidence aliunde, the existence of a conspiracy, but the testimony of one conspirator is admissible against a co-conspirator without the necessity of establishing through an independent source the existence of the conspiracy."

In addition to proof by independent evidence of the existence of the conspiracy, the State must also demonstrate that the declaration or act of the coconspirator was made or done in furtherance of the conspiracy and during its pendency. We observe that the "furtherance" requirement is interpreted broadly. Levie, *Hearsay and Conspiracy*, 52 Mich. L. Rev. 1159, 1168 (1954) puts it this way:

> "If *some* connection is established between the declaration and the conspiracy then the declaration is taken in furtherance of the conspiracy." (Emphasis supplied).[8]

In the instant case Green's inquiry of Hirsch as to whether Hirsch's father had opened a file on the Harrington matter, is sufficiently related to the subject matter of the conspiracy to satisfy the "furtherance" prerequisite. Such an inquiry manifests an intent to continue to misrepresent that the "Harrington case" had been handled without the intervention of the State's Attorney's office and in a *bona fide* manner.

The second prerequisite that must be met in order to utilize the coconspirators hearsay exception is that the act or

---

**8.** Because of the broad interpretation applied to the furtherance requirement, at least one writer has referred to conspiracy as the prosecutor's "darling" and the defendant's "nightmare". *See Comment: The Conspiracy Hearsay Exception and Its Erratic Application,* 76 Dick. L. Rev. 728 (1972); Klein, *Conspiracy — The Prosecutor's Darling,* 24 Brooklyn L. Rev. 1 (1957); Note, *The Hearsay Exception for Co-Conspirators' Declarations,* 25 U. Chi. L. Rev. 530 (1958); Garland & Snow, *The Co-Conspirators Exception to the Hearsay Rule: Procedural Implementation and Confrontation Clause Requirements,* 63 J. Crim. Law 1 (1972).

declaration must have been made during the "pendency" of the conspiracy. By "pendency" we mean the duration of the unlawful agreement, but that does not mean that the conspiracy continues *ad infinitum*. The duration of a conspiracy is restricted to the accomplishment of its "main aim". *Krulewitch v. United States*, 336 U. S. 440, 69 S. Ct. 716, 92 L. Ed. 790 (1949). It is patent in the case now before us that the "main aim" of the conspiracy was to cover up the Harrington case transactions by attempting to establish that someone outside the State's Attorney's office had handled the expungement petition.[9] Green's telephone call to Hirsch was during the pendency of the conspiracy and in furtherance thereof. It makes no difference that Hirsch had, unbeknown to Green and Irvin, secretly withdrawn from the conspiracy. Neither Green nor Irvin knew of that withdrawal, and in any event, they continued to act in accordance with the unlawful agreement. The conspiracy did not terminate with Hirsch's covert abandonment of it. If a coconspirator unilaterally resigns from an illegal pact involving more than two conspirators, the conspiracy is at an end as to him only. *See* Levie, *Hearsay and Conspiracy, supra* at 1174.

The third statement was that of Green made to the State police. That occurred after Irvin had previously made his statement to the police. Irvin attacks the admissibility of that statement, but we hold it admissible for the same reasons that we have previously stated relative to the admissibility of the police transcription of the telephone call.

The independent evidence of the existence of the

---

**9.** We note that the Supreme Court in Dutton v. Evans, 400 U. S. 74, 81, 91 S. Ct. 210, 27 L.Ed.2d 213 (1970) said that ". . . [I]t does not follow that because the federal courts have declined to extend the hearsay exception to include out-of-court statements made during the concealment phase of a conspiracy, such an extension automatically violates the Confrontation Clause." A recent commentator observed in *The Conspiracy Hearsay Exception and Its Erratic Application, supra,* that "There is a post-conspiracy concealment phase during which admissions and declarations are often made. The concealment phase idea was soundly rejected in *Krulewitch* as it involved federal trials, but clearly given new life in *Dutton*." 76 Dick. L. Rev. 728, 740 (1972).

conspiracy was amply provided through the cumulative effect of the testimony of Harrington, Miles, Hirsch's father and the State police. We think Judge Clapp did not err in receiving into evidence Hirsch's testimony concerning the July 1972 conversation with Green, the transcription of Green's telephone conversation with Hirsch, and Green's statement to the Maryland State police.

*Judgments affirmed.*
*Costs to be paid by appellant.*