492 A.2d 939

Terry Steven THOMAS

v.

STATE of Maryland.

No. 1295, Sept. Term, 1984.

Court of Special Appeals of Maryland.

May 21, 1985.

338

Kathleen M. Brown, Assigned Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Nicolette Prevost, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, William R. Hymes, State's Atty. and Carol A. Robertson, Asst. State's Atty. for Howard County, Ellicott City, on the brief), for appellee.

Argued before GILBERT, C.J., and ROSALYN B. BELL and KARWACKI, JJ.

KARWACKI, Judge.

Terry Steven Thomas, the appellant, was convicted by a jury in the Circuit Court for Howard County (Nissel, J. presiding), of the first degree murder of Dwayne Matthews, the use of a handgun in the commission of that crime of violence, and conspiracy to rob Dwayne Matthews. For the murder he was sentenced to life imprisonment. A ten year consecutive sentence was imposed on the handgun charge, and a concurrent ten year sentence ordered on the conspiracy conviction.

Dwayne Matthews was a dealer in marijuana and cocaine. On January 5, 1984, Officer Joseph Johnson of the Howard County Police Department responded to a call about a shooting at Matthew's apartment. Officer Johnson found the apartment in disarray. He discovered Matthews's body in the bedroom, lying face down on the bed. Matthews's hands had been tied behind his back and he had been shot in the back of the head. Two women and one man were

outside the apartment. Officer Johnson testified that the man, Dexter Marshall, was visibly upset.

Dexter Marshall testified that he knew the victim very well. He also stated that he knew Ricky Reese and that Reese and he had occasionally visited the victim's apartment together. Marshall had been at the victim's apartment on the evening of January 4, 1984 with Reese, a cousin of the appellant. The next morning, Marshall returned to the apartment and discovered the victim's body.

When questioned by defense counsel about his suspected involvement in a drug operation with the victim, Marshall exercised his Fifth Amendment right and refused to answer. Defense counsel further attempted to question Marshall about an alleged argument with the victim on January 4th, the subject of which was the drug operation. Marshall again refused to answer, although on redirect he denied having an argument with the victim.

On the evening of January 4, 1984, the victim had been conducting the sale of drugs with the assistance of a man named Giovani Pickett. Pickett testified that on that evening Marshall and the victim had had a disagreement about drug sales.

Nathan Lee, another friend of the victim, had also been in the apartment on January 4th. He testified that although he had never seen the appellant with the victim, he had seen the appellant with Ricky Reese. Lee had seen Reese in the victim's apartment on occasion. Lee also refused to answer any questions on cross-examination concerning his alleged involvement in a drug dealing operation with Dexter Marshall and the victim.

In January of 1984 the Prince George's County Police received information from an informant about Matthews's death. The police were told that three men were involved, one of whom was named Angelo Johnson. The informant also implicated the appellant as the man who actually shot the victim. Angelo Johnson testified at trial pursuant to a plea agreement with the State.

According to Johnson's testimony, on January 4, 1984, he and the appellant were discussing ways to raise money when the appellant suggested a "hustle." Johnson drove the appellant to the appellant's apartment, where the appellant got a shotgun and placed it in the trunk of Johnson's car. The two men then drove to Laurel to pick up Ricky Reese. According to Johnson, as he drove the car, following directions given by the appellant, Reese described a cocaine buy for $27,000.00 which was to take place at the victim's apartment that night. Reese described the victim's apartment and the location of guns and money. Johnson testified that the appellant said to Reese, "I'm going to have to take him out." Johnson stated that when they arrived at the apartment complex, Reese got out of the car to check Matthews's apartment, and when he returned, said that he thought Matthews was at home. Reese and the appellant then went into the building, leaving Johnson in the car. Ten or fifteen minutes later, Reese returned to the car and said that the appellant was still in the victim's apartment. A short time later, Johnson and Reese went to the door of the apartment, through which they could hear the victim pleading with the appellant. The appellant opened the door to the apartment, and Johnson and Reese then proceeded to remove a number of items from the apartment. Johnson testified that he saw the appellant with a gun in his hand, forcing Matthews into the bathroom. Johnson and Reese then returned to the car to wait for the appellant. After fifteen minutes, the appellant returned to the car carrying a stereo speaker. Johnson then drove away.

Johnson testified that the appellant asked him to stop the car so that he could check a gun. The appellant said to Johnson, "I had to off him." He told Johnson that he thought a bullet might have stuck in the gun and he wanted to check it, and that if a bullet had stuck in the gun, "he would have to go back and finish the job." According to Johnson, the appellant found no bullets in the gun.

Upon their return to the appellant's apartment, the three men divided the items taken from the victim's apartment. Johnson took his share, which included a jacket and a telephone, home with him. A number of the other items were found in the appellant's apartment.

Angelo Johnson's wife, Victoria, testified that after hearing about the murder on the news, she asked the appellant, "How could you kill somebody like that"? to which the appellant replied, "It was nothing to it," and "It's done professionally." She further testified that the appellant had called her from the detention center and told her to change her story.

The appellant elected not to testify on his own behalf.

He now challenges his convictions on four grounds:

I. The trial court erred in denying his motion to strike the testimony of Dexter Marshall and Nathan Lee, after they refused to answer questions relating to drug dealings with Dwayne Matthews;

II. The trial court erred in allowing Angelo Johnson to testify concerning comments made by Ricky Reese when he returned from checking Dwayne Matthews' apartment;

III. The testimony of Angelo Johnson, an accomplice in the offense with which the appellant was charged, was not sufficiently corroborated and the evidence adduced at trial was therefore insufficient to support the appellant's convictions; and

IV. During her opening statement, the prosecutor improperly referred to proposed testimony from Wanda Kenner, who was not called to testify at trial.

We have determined that none of these contentions merit reversal, and therefore we affirm the appellant's convictions.

## I.

■ The appellant challenges the trial judge's denial of his motion to strike the testimony of two witnesses who

invoked their Fifth Amendment privilege against self-incrimination. This motion was made by defense counsel during the cross-examination of Marshall. At that time counsel requested not only that Marshall's testimony be stricken, but that the testimony of Nathan Lee, who had testified on the previous court day, should likewise be stricken from the record. Although the appellant by his motion to strike has preserved for our review the propriety of the trial court's denial of that motion in so much as it affected Marshall's testimony, his motion to strike the testimony of Nathan Lee was untimely. The appellant has therefore waived his right to have us consider that aspect of this issue on appeal. Maryland Rule 1085. With respect to the trial court's denial of the appellant's request to strike Marshall's testimony, we see no cause to disturb that ruling, since: (1) the trial judge correctly determined that Marshall properly invoked and did not waive his privilege; (2) the judge restricted Marshall's assertion of the privilege to incriminating questions; and (3) the privileged testimony related to collateral matters, so that the appellant was not denied his Sixth Amendment right to confront the witnesses against him.

The United States Supreme Court has provided guidance in determining when the Fifth Amendment privilege may be properly invoked by a witness. The Supreme Court said in *Hoffman v. United States*, 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951):

The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish

the hazard of incrimination. It is for the court to say whether his silence is justified, and to require him to answer if "it clearly appears to the court that he is mistaken."

(Citations omitted).

In *Richardson v. State*, 285 Md. 261, 265, 401 A.2d 1021 (1979), the Court of Appeals outlined the appropriate procedure to be followed in those situations where a witness desires to invoke the privilege. The Court of Appeals stated:

Our predecessors clearly set forth in numerous cases the procedures to be followed in determining when a witness may refuse to testify on grounds that the evidence adduced may incriminate him. The witness should first be called to the stand and sworn. *Midgett v. State*, 223 Md. 282, 289, 164 A.2d 526 (1960), *cert. denied*, 365 U.S. 853, 81 S.Ct. 819, 5 L.Ed.2d 817 (1961). Interrogation of the witness should then proceed to the point where he asserts his privilege against self-incrimination as a ground for not answering a question. *Shifflett v. State*, 245 Md. 169, 173–74, 225 A.2d 440, 443 (1967). If it is a jury case, the jury should then be dismissed and the trial judge should attempt to "determine whether the claim of privilege is in good faith or lacks any reasonable basis." *Midgett v. State, supra*, 223 Md. at 289 [164 A.2d 526]. If further interrogation is pursued, then the witness should either answer the questions asked or assert his privilege, making this decision on a question by question basis. *Royal v. State*, 236 Md. 443, 447, 204 A.2d 500, 502 (1964).

There may occur those instances, however, when a proper invocation of the Fifth Amendment privilege runs afoul of a defendant's Sixth Amendment right to cross-examine the State's witnesses. *See Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). The test for determining when the Fifth Amendment privilege yields to the Sixth

Amendment right to confrontation was well articulated in *United States v. Cardillo,* 316 F.2d 606 (2d Cir.1963), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963):

Since the right to cross-examine is guaranteed by the Constitution, a federal conviction will be reversed if the cross-examination of government witnesses has been unreasonably limited. *E.g., Alford v. United States,* [282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931)]; *United States v. Masino,* 2 Cir.1960, 275 F.2d 129; *United States v. Lester,* 2 Cir.1957, 248 F.2d 329. However, reversal need not result from every limitation of permissible cross-examination and a witness' testimony may, in some cases, be used against a defendant, even though the witness invoked his privilege against self-incrimination during cross-examination. In determining whether the testimony of a witness who invokes the privilege against self-incrimination during cross-examination may be used against the defendant, a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination. Where the privilege has been invoked as to the purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him. *United States v. Kravitz,* 3 Cir.1960, 281 F.2d 581; *Hamer v. United States,* 9 Cir.1958, 259 F.2d 274; *United States v. Toner,* 3 Cir. 1949, 173 F.2d 140. On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part, *Montgomery v. United States,* 5 Cir.1953, 203 F.2d 887; *cf. United States v. Andolschek,* 2 Cir.1944, 142 F.2d 503;

*Stephen v. United States,* 6 Cir.1943, 133 F.2d 87; *United States v. Keown,* W.D.Ky.1937, 19 F.Supp. 639.

*Id.* at 611.

■ In the case *sub judice,* the trial court properly determined that Marshall could invoke the privilege with respect to questions relating to his conduct violative of Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 286. Marshall limited the privilege to those questions, and responded to all questions concerning non-privileged facts.[1] Our review of the record discloses that Marshall invoked the privilege in response to six questions: three of the questions inquired into his involvement in drug operations; the remaining three dealt with an alleged argument between the witness and the victim, which had as its substance the drug operation.

Furthermore, all of the privileged responses related to collateral matters. None of the questions precipitating Marshall's invocation of the privilege related to questions asked on direct examination regarding his relationship with the victim or the events of January 4, 1984. Rather, the six questions posed by defense counsel attempted to impeach Marshall's credibility by inquiring into his involvement in a drug operation and a disagreement between him and the victim with respect to that operation. The questions were designed to explore Marshall's general credibility, rather than to test the truth of his direct testimony or to seek to establish Marshall's untruthfulness in testifying to specific events of the crime charged. Because the invocation of the privilege by Marshall was limited to purely collateral matters, we hold that the appellant was not denied his right to confront Marshall by cross-examination.

## II.

The appellant next argues that the trial judge improperly overruled his objection to Johnson's testimony regarding

---

**1.** We note that Marshall did not waive his privilege by testifying concerning privileged matters on direct examination.

comments made to him by Ricky Reese when Reese returned from checking Dwayne Matthews's apartment. Johnson was allowed to testify to the statements made by Reese under the evidentiary rule which provides:

When several persons are proved to have unlawfully conspired to commit a crime, the acts and declarations of any conspirator during such conspiracy, and in furtherance thereof, are admissible as substantive evidence against any co-conspirator on trial. Wharton's Criminal Evidence (12th Ed.) Vol. II, Sec. 416.

*Johnson v. State*, 9 Md.App. 327, 340, 264 A.2d 280, *cert. denied*, 258 Md. 728 (1970). The appellant contends that the conspiracy, if any, was formed and completed well before the three co-defendants arrived at the apartment complex, so that any statements made after that time would not be admissible under the co-conspirators rule. We disagree.

In *Irvin v. State*, 23 Md.App. 457, 472–73, 328 A.2d 329 (1974), *aff'd.* 276 Md. 168, 344 A.2d 418 (1975), we addressed the admissibility of statements of a co-conspirator. There we said:

[T]he State must also demonstrate that the declaration or act of the coconspirator was made or done in furtherance of the conspiracy and during its pendency. We observe that the "furtherance" requirement is interpreted broadly. Levie, *Hearsay and Conspiracy* 52 Mich.L.Rev. 1159, 1168 (1954) puts it this way:

"If *some* connection is established between the declaration and the conspiracy then the declaration is taken as in furtherance of the conspiracy."

In discussing the pendency requirement, we said:

The second prerequisite that must be met in order to utilize the coconspirators hearsay exception is that the act or declaration must have been made during the "pendency" of the conspiracy. By "pendency" we mean the duration of the unlawful agreement, but that does not mean that the conspiracy continues *ad infinitum*. The

duration of a conspiracy is restricted to the accomplishment of its "main aim". *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

*Id.* at 473, 328 A.2d 329.

■ It is evident from the record that the object of the conspiracy among Johnson, Reese and the appellant was the robbery of Dwayne Matthews. When Reese left the car, immediately after the conspirators arrived at the apartment complex, for the purpose of "checking out" Matthews's apartment, the object of the conspiracy had not yet been achieved, nor had it been achieved upon Reese's return to the car. We conclude, therefore, that Reese's statement that Matthews was in the apartment alone was made in furtherance of and during the pendency of the conspiracy. The trial court did not err in overruling the appellant's objection to the admissibility of that statement.

### III.

The appellant further contends that the testimony of codefendant Angelo Johnson was not sufficiently corroborated and the evidence adduced at trial was therefore insufficient to support the appellant's convictions. He claims that the only positive evidence introduced by the State to establish his criminal agency was the testimony of Johnson, and that since an accused cannot be convicted on the basis of an accomplice's testimony alone, *Luery v. State,* 116 Md. 284, 81 A. 681 (1911), his convictions must be overturned.

The Court of Appeals described the quantum of evidence necessary for corroboration of an accomplice's testimony in *Brown v. State,* 281 Md. 241, 244–45, 378 A.2d 1104 (1977);

Not much in the way of evidence corroborative of the accomplice's testimony has been required by our cases. We have, however, consistently held the view that while the corroborative evidence need not be sufficient in itself to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the

crime itself. *See Wright v. State,* 219 Md. 643, 150 A.2d 733 (1959). If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. *McDowell v. State,* 231 Md. 205, 189 A.2d 611 (1963). That corroboration need not extend to every detail and indeed may even be circumstantial is also settled by our cases. *Nolan v. State,* 213 Md. 298, 131 A.2d 851 (1957); *Brown v. State,* 210 Md. 301, 123 A.2d 324 (1956).

■ The record reveals that sufficient independent evidence was adduced at trial to corroborate Johnson's testimony. Johnson testified that the appellant shot the victim during the course of a robbery at the victim's apartment. Victoria Johnson testified that her husband brought home with him drugs and a telephone. She further testified that the appellant told her that he had killed the victim and that he had later asked her to change her story. Since Victoria Johnson was not an accomplice, her testimony does not require corroboration. *Johnson v. State,* 9 Md.App. 327, 343, 264 A.2d 280, *cert. denied,* 258 Md. 728 (1970). Additional evidence was presented to show that the victim's property was seen in the appellant's apartment sixty days later.

Furthermore, the State produced ample evidence to demonstrate that the appellant murdered the victim with the requisite specific intent. Two bullets were recovered from the victim's body. His body was discovered on the bed in his own apartment, with hands bound behind his back. The appellant was seen with a gun in his hand while in the apartment with the victim. From the above we hold that there was sufficient corroborative evidence relating to the appellant's criminal agency.

## IV.

■ The appellant argues finally that the prosecutor improperly referred during her opening statement to testi-

mony that would be presented by Wanda Kenner, who was not subsequently called to testify. Our review of the record, however, fails to disclose that this issue was raised before the trial judge. We do find that the witness, Wanda Kenner, was the subject of a dispute between the prosecutor and defense counsel as to whether the trial judge should have given a missing witness instruction in response to the State's decision not to call Ms. Kenner to testify. The record further discloses that the witness had been subpoened and was available in the courtroom to be called by either party at any time during trial. Thus, the trial court was correct in denying the appellant's request for the missing witness instruction. *Briscoe v. State*, 40 Md.App. 120, 134, 388 A.2d 153, *cert. denied*, 283 Md. 730 (1978). The appellant does not here challenge that action by the trial court. Rather, he questions the propriety of the prosecutor's reference during opening statement to Ms. Kenner, and asserts that he was substantially prejudiced thereby. Since this question was not raised below, however, it has not been preserved for our review. Md.Rule 1085.

JUDGMENT AFFIRMED;

COSTS TO BE PAID BY THE APPELLANT.