**UNITED STATES of America,**
**Appellee,**

v.

**Joseph GERNIE and Edward Ogull,**
**Defendants-Appellants.**

**No. 173, Docket 24634.**

United States Court of Appeals
Second Circuit.

Argued Nov. 18, 1957.

Decided Feb. 13, 1958.

Writ of Certiorari Denied May 26, 1958.
See 78 S.Ct. 1006.

See also 149 F.Supp. 272.

Jacob W. Friedman, New York City,
for defendants-appellants.

Jerome J. Londin and Robert B. Fiske,
Jr., Asst. U. S. Attys., Southern District
of New York, New York City (Paul W.
Williams, U. S. Atty., Southern District

of New York, New York City, on the brief), for appellee.

Before HAND, MEDINA and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

The four principal questions on appeal are (1) whether there was sufficient evidence to support Joseph Gernie's conviction, (2) whether the court erred in denying defense motion to dismiss the indictment against Ogull because of entrapment, (3) whether the court erroneously restricted cross-examination of narcotic agent Wurms regarding the whereabouts of the government's former special employee, Max Berner, who was not produced as a witness, and (4) whether it was error to call Benjamin Harell to testify in view of his claim of Fifth Amendment privilege.

Gernie and Ogull were charged, with Philip Buzzeo and Michael Mayer, with conspiracy to violate the narcotic laws during the period April 1, 1956–October 19, 1956 (Count 7). They were also charged with the sale of heroin: Ogull and Buzzeo on April 14, 1956 (Count 1), all four defendants on June 4, 1956 (Count 2), Gernie, Ogull and Buzzeo on July 12, 1956 (Count 3), Gernie and Mayer on August 2, 1956 (Count 4), and Gernie and Mayer on August 6, 1956 (Count 5). In addition, Gernie and Mayer were charged with possession of heroin on September 18, 1956 (Count 6), 21 U.S.C.A. §§ 173, 174; 18 U.S.C.A. § 371.

Buzzeo and Mayer pleaded guilty to all the charges against them and were sentenced respectively to 5 years in prison and a fine of $5,000, and 5 years, 6 months in prison.

At the end of a six day trial the jury found Gernie and Ogull guilty as charged on all counts, except Count 4 which had been withdrawn by the government at the end of its case.

On February 19, 1957, Judge Palmieri sentenced Gernie[1] to 10 years imprisonment and fined him $5,000, and Ogull to 5 years imprisonment on Counts 1, 2, 3 and 7, to be served concurrently.

A narrative of the evidence concerning the clandestine operations of the four defendants over a period of several months discloses an abundance of evidence both direct and circumstantial to support the jury's verdict of guilty.

On April 13, 1956 government agents first made contact with the defendants when special employee Max Berner introduced agent Wurms to Edward Ogull in King's Diner at 360 Twelfth Avenue, New York. Ogull summoned Buzzeo by telephone. Finally Wurms, Buzzeo and Berner talked in a parked automobile and Wurms arranged to buy a quarter kilogram of 85% pure heroin from Buzzeo that night for $2,750. The delivery did not take place that night as scheduled as Buzzeo was cautious, and, after visiting several places with Wurms, he told Wurms that his people were satisfied and he would have to return the following evening to the Ship Ahoy Restaurant at 101 West 66th Street. On April 14 they went to a bar at 200 West 70th Street and from there to a Cadillac parked at 72nd Street and Riverside Drive. While they were driving east in the Cadillac Buzzeo handed Wurms a paper bag containing the heroin and Wurms paid him $2,750. As Wurms got out Buzzeo said if he wanted some more heroin he should contact Eddie, meaning Ogull.

Wurms, with Max Berner, again met Ogull on April 20 at McGinnis' Bar, 304 West 40th Street, and when Wurms complained of the "merry-go-round" he had gone on for the heroin, Ogull said he would not be put to such trouble in the future.

A week later, on April 27, Wurms and Berner went to the Scarlet Patch Bar, 403 East 57th Street and Wurms talked privately with Ogull who wanted to sell

1. Gernie's sentence was 5 years on Counts 2 and 3, and 10 years on Counts 5, 6 and 7, the sentences to run concurrently. A $5,000 fine on Count 7 was also imposed.

him cocaine. According to the government's case, Berner had no contacts with the defendants after April 27.

Wurms next telephoned Ogull on May 3 at Pier 74 at a number given him by Max Berner and Wurms and Ogull met later at the Scarlet Patch. Subsequent calls by Wurms on May 7, 10 and 11 were unproductive as Ogull said he was unable to reach "Bob," referring to Buzzeo. At another meeting at the Scarlet Patch on May 22 Ogull rebuffed Wurms' suggestion that he be introduced to a new source of supply.

After a telephone call and meeting with Ogull, on June 1, Wurms met Buzzeo at the Ship Ahoy at 5:00 P.M. on June 2 where arrangements were made to deliver a quarter kilogram at the same place at 9:30 P.M. two days later.

On June 4, after a short talk at the Ship Ahoy, Wurms and Buzzeo drove in Buzzeo's Chevrolet to 76th Street where they parked near the Devonshire Garage just east of Broadway at 9:55 P.M. Wurms gave Buzzeo $3,000 in cash. Buzzeo left the car and entered the nearby Lighthouse Cafe where he made a telephone call. Five minutes later the defendant Gernie entered the cafe and joined Buzzeo at the bar. After a brief conversation, Gernie made a telephone call. Then both men went to the basement and returned to the bar a few minutes later. Gernie then went to the front window and looked out for about five minutes. At about 10:05 P.M. defendant Michael Mayer drove by in a 1955 Oldsmobile automobile usually driven by Gernie. Mayer proceeded to the Devonshire Garage where he parked and entered the garage office. When Mayer drove by the Lighthouse Cafe, Gernie turned abruptly, returned to Buzzeo at the bar and proceeded to the garage office where he met Mayer. Mayer then drove away in the Oldsmobile and Gernie returned to Buzzeo. They then left the cafe and proceeded to the garage office. Buzzeo remained in the office only a moment. Gernie watched him carefully as he returned to the car where Wurms was waiting. Wurms and Buzzeo drove off in Buzzeo's Chevrolet and, en route, Buzzeo handed Wurms a package containing the heroin.

Wurms next met with Ogull and Buzzeo on June 12 at Charlie's Diner, 394 Twelfth Avenue, where they discussed Wurms' complaint about the quality of the heroin purchased on June 4 and a reduction in price for the next purchase.

A July 11 meeting of Wurms and Buzzeo, arranged by Ogull, led to the sale of another quarter kilogram for $2,800 on July 12. Wurms and Buzzeo met at the Dolphin Cafe, 1975 Broadway at 9:30 P.M. and drove in Buzzeo's Chevrolet to the Devonshire Garage where they parked east of the office. Wurms gave Buzzeo $2,800 in bills the serial numbers of which he had recorded. A few minutes later Gernie drove into the garage entrance in the 1955 Oldsmobile. Gernie parked the car in the garage, met Buzzeo at the side door of the Lighthouse Cafe on 76th Street, they shook hands and went in and when they came out a few minutes later, Gernie was walking behind Buzzeo. They both went into the garage and Buzzeo got into Gernie's Oldsmobile, sat on the front seat for a moment with his feet remaining on the pavement, got out and spoke to Gernie, and then rejoined Wurms in the Chevrolet. Buzzeo then took a package from under his sport shirt and gave it to Wurms who later found that it contained heroin. When Gernie was arrested 68 days later on September 18, he had in his wallet one of the $100 bills which Wurms had given to Buzzeo on July 12.

Subsequent events in August further evidenced the business relationship of defendants Gernie and Mayer and the stealthy nature of their operations.

On August 2, 1956, two men, one of whom was Benjamin Harell, met Mayer at the West End Garage. Mayer immediately drove off in his Pontiac and went into 307 West 69th Street, where he lived. Gernie had already entered the building and his Oldsmobile was parked in the block at the time. Gernie came out of the building with Mayer and when Mayer drove off to a meeting with

Harell, Gernie reentered 307 West 69th Street.

On August 6, 1956 Gernie drove up to 67th Street and Columbus Avenue, where he parked. Gernie walked over to Mayer's Pontiac and threw a dark package into it. He then entered the 67th Street Garage, where he met Mayer. Mayer immediately left the 67th Street Garage and drove off in the Pontiac to 307 West 69th Street which he entered. Gernie was joined in the 67th Street Garage by Harell, who, after a brief conversation, drove away. Narcotic agents arrested Harell at 102nd Street and the East River Drive and found over 2 ounces of heroin.

Mayer was arrested on September 18, 1956 in 307 West 69th Street. In his pocket the agents found two double glassine envelopes containing about 1½ ounces of heroin. In Mayer's apartment the agents found 56 ounces of heroin in a leatherette case, several brown paper bags, and under his daughter's bed a Speed stapling machine and miscellaneous assorted equipment for the weighing, cutting and packaging of narcotics. There was expert testimony to show that the Speed stapling machine found in Mayer's apartment was the machine which pressed the staples to seal: (1) the quarter kilogram of heroin purchased on July 12, 1956 by Wurms, when Buzzeo got it from Gernie's Oldsmobile, and (2) the 2 ounces of heroin seized from Harell on August 6, 1956 after his meeting with Gernie.

Gernie was also arrested on September 18 and, in addition to the $100 bill already mentioned, he had in his possession the registration to the Oldsmobile car, although he denied having anything to do with the car or that he drove a car. Ogull, when he was arrested on October 4, denied that he had ever seen agent Wurms.

█ The mere recital of the evidence answers Gernie's claim that the evidence against him was insufficient. It was quite ample to sustain his conviction.[2]

█ The second claim of error involves Ogull's defense of entrapment. Ogull took the stand and claimed that Max Berner and agent Wurms had entrapped him into arranging a contact with Buzzeo for the purchase of narcotics in return for their promising to help him in the financing of a real estate venture. Ogull admitted several meetings with Berner and Wurms and his introduction of Buzzeo to Wurms and claimed that he did not see them after July 12. As Wurms' version of the conversations and the dealings with Ogull was quite at variance with Ogull, who admitted that nothing was ever done for him with regard to any financing or any real estate, the issue of entrapment was a question of fact for the jury. Judge Palmieri's instructions on entrapment and on all phases of the case were clear and accurately guided the jury. In view of Ogull's activities lasting from April to August 1956, and, according to his own testimony, from April to July 12, 1956, and the insubstantial nature of his explanation for introducing Buzzeo to agent Wurms, the motion to dismiss was properly denied, and the judge was fully warranted in leaving the question of entrapment to the jury.

█ The third claim of error has to do with the curtailment of the cross-examination of agent Wurms regarding Max Berner, a special employee of the Narcotics Bureau, and the government's failure to produce him or to account for his absence.

2. Gernie did not take the stand, but instead called his co-defendant Michael Mayer who had already pleaded guilty. Mayer took the full blame for the transactions charged and said that Gernie had had nothing to do with them. However, his testimony regarding Gernie's visits to Mayer's apartment at 307 West 69th Street, Gernie's use of the Oldsmobile car which belonged to a mutual relative of Mrs. Mayer and Gernie, and his admissions to meeting Gernie at the Devonshire Garage to pick up the Oldsmobile, may have helped the government more than the defendant Gernie.

A study of the record reveals that the defense had the means of securing information as to Berner's whereabouts and it chose not to secure the information. Indeed from what transpired at the trial we conclude that the defense abandoned its demand for Berner and that it cannot now claim that failure to produce him was error. Furthermore, there was no showing that the government had any more information as to Berner's whereabouts than was available to the defense.

On February 4, 1957, before the jury was selected, counsel for Ogull, in a conference held in the robing room, asked the government "to have Mr. Berner here for me so that I may speak to him, because if the Government does not call him as a witness, and I feel the Government should, I might have to," because his testimony might have a bearing on the issue of entrapment. Counsel said he had been trying to find him but had been unable to locate him although he had known Berner for many years. He requested the court to ask the government to produce him "so I might speak with him."

The Assistant United States Attorney then stated that to the best of his knowledge Berner was not available and the government could not produce him and did not intend to use him.

The Court said to the Assistant "I would appreciate it if you communicate with the agent in charge of this case in order to ascertain his whereabouts, and if he can be made available, please see that that is done. If he can't, please advise me and the attorney as quickly as possible."

Counsel then argued that it was a "very unfair method of prosecuting" for the government not to produce Berner as its witness. The trial judge pointed out that he was not in a position to instruct the government how to prove its case, and he added "As the evidence proceeds you can make such motions and requests as you think you are justified in making."

The government's first witness, agent. Wurms, was cross-examined at length regarding Max Berner. Part of the cross-examination went thus:

"Q. You have his address, have you not? A. The last address.

"Q. *I don't want to know his address.* Does your office have his address? A. One address here in. Brooklyn we had for him.

"Q. Do you know where his wife lives? A. Yes, sir.

"Q. Were you to his home? A. Yes, sir." (Italics supplied.)

Wurms testified further that he had last seen Berner in the latter part of September 1956 and that he had no information of his whereabouts.

But it is clear that Ogull's counsel deliberately chose not to ask for further and more specific information when agent Wurms testified regarding Berner's business association, that he had a Brooklyn address for Berner, that he knew where his wife lived and had been to his home. He said "I don't want to know his address."

On February 7, arguing a motion to dismiss at the end of the government's case, Ogull's counsel stressed the weakness of the case because of the failure to produce Berner but no further reference was made to the previous demand to produce Berner. In fact, after the first day of trial no further demand of any kind was made for Berner's production or for any information concerning him. It seems quite apparent that the subject of producing Berner was dropped by common consent. Ogull, perhaps because he knew Berner was not to be called as a witness, himself took the stand. Ogull's counsel may well have concluded that as things stood he no longer saw any advantage in pressing for Berner's appearance. He thus left the question open for argument to the jury that there was a vital weakness in the government's

case by reason of Berner's failure to testify.[3]

Thus it appears that the defendant Ogull knew who Berner was and in fact had known him for two years. The government witness, agent Wurms, fully answered all questions which had any bearing on where Berner was or where he might be found. Even more, Wurms indicated his ability to give more detailed information regarding Berner and the defense chose not to follow it up.

Although on the first day of the trial the judge asked the Assistant United States Attorney to inform him and defense counsel if Berner could not be made available, no further mention was made of this request. The trial judge coupled his request with the statement to defense counsel that, as the evidence proceeded, he could make such motions and requests as he might wish. No further motion or request was ever made during the remaining week of the trial. Instead, defense counsel pursued a half-hearted cross-examination of Wurms on matters touching on Berner's whereabouts and thereafter counsel was content to drop the matter after it became clear that Berner would not be produced by the government.

Roviaro v. United States, 1956, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639, relied on by the appellants, is not in point as the trial court there had sustained the government's refusal to divulge the name or whereabouts of "John Doe" by bill of particulars before trial and by cross-examination of the government's witnesses. In Roviaro the defense never did know who "John Doe" was. Here Ogull had known Max Berner for at least two years. Sorrentino v. United States, 9 Cir., 163 F.2d 627, cited with approval in Roviaro v. United States, 353 U.S. 53, 62 fn. 12, 77 S.Ct. 623, 628.

Thus we come to the question of whether it was error for the government to call Benjamin Harell as a witness in view of his refusal to testify regarding the source of the heroin of which he had admitted possession on August 6, 1956.

After agents had observed Harell and one Joseph Edwards meet with defendant Gernie in the 67th Street Garage, he was arrested on the East River Drive in possession of 2 ounces of heroin. He was indicted on August 31, subsequently pleaded guilty to all three counts which charged unlawful possession of 2½ ounces of heroin, and conspiracy with Edwards and others to traffic in narcotics in violation of law, and, prior to Gernie's trial, he was sentenced to 5 years imprisonment.

The government called Harell as its witness. Harell in answer to questions admitted that he had heroin in his possession when he was arrested in August, and that he had pleaded guilty to an indictment, and had received a 5 year sentence. When the prosecutor asked him where he obtained the heroin he said he wanted to "take the Fifth Amendment" and refused to answer. The trial judge finally sustained Harell's refusal, and in his charge to the jury he instructed the jury that this refusal was not to be taken as evidence against the defendants.

The government had a right to call Harell to testify. The testimony of his meeting with Gernie and his possession of heroin immediately thereafter was material and relevant to the case. Had the government not produced him the defense could have argued that its failure to call him showed that he would not corroborate the testimony of the agents. Under such circumstances it makes no difference whether the government has reason to believe that the witness will refuse to testify. It has a right to produce the witness and thus show the jury that it is bringing forward such witnesses as may have knowledge bearing on the case. United States v. Romero, 2 Cir., 1957, 249 F.2d 371, and United States v. Cioffi, 2 Cir., 1957, 242 F.2d 473, 477.

3. We are not informed regarding the summation of Ogull's counsel. While it was recorded by stenographic notes, the notes have not been transcribed.

Indeed the government had the right to compel Harell to answer the questions as he had pleaded guilty and could not be further incriminated by answering where he had obtained the heroin. United States v. Romero, supra; United States v. Cioffi, supra.[4] We think the judge erred in sustaining the witness' claim of privilege.

In any event the judge's charge that the jury was not to consider Harell's refusal as evidence against the defendants was all they were entitled to.

The other claims of error are too insubstantial to require comment. The judge quite properly admitted the $100 bill in evidence against Gernie.

Judgments of conviction are affirmed.

---

4. Thus we find it unnecessary to refer to additional facts which indicated that Harell had already talked freely on at least two occasions, and the prosecutor had reason to believe that he would answer questions again.

We also note that under the Narcotic Control Act of 1956, 18 U.S.C.A. § 1406, the prosecutor had the power to give the witness immunity and compel his answers, although the government did not choose to act under this statute after the judge sustained Harell's claim of privilege.