500 A.2d 650

Clinton W. ELLISON

v.

STATE of Maryland.

No. 1450, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Dec. 4, 1985.

Certiorari Granted March 12, 1986.

Clarence W. Sharp, Assigned Public Defender of Annapolis (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Valerie W. Loftin, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City, Ruth M. Finch and Peter M. Semel, Asst. State's Attys. for Baltimore City on brief), Baltimore, for appellee.

Argued before MOYLAN, BLOOM and GETTY,* JJ.

MOYLAN, Judge.

The appellant, Clinton W. Ellison, was convicted by a Baltimore City jury, presided over by Judge Joseph I. Pines, of murder in the first degree and robbery. In an otherwise garden-variety appeal, one issue stands out.

---

* Judge Getty participated in the hearing of this case and decision thereon, but retired before the opinion was filed.

## *The Public Has a Right to Every Man's Evidence*

To place the issue, one involving the privilege against compelled testimonial self-incrimination, in its proper framework, we begin with the universally recognized principle enunciated by Lord Chancellor Hardwicke in 1742 that "the public has a right to every man's evidence." [1] *Kastigar v. United States*, 406 U.S. 441, 443, 92 S.Ct. 1653, 1655, 32 L.Ed.2d 212, 216 (1972); *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626, 644 (1972). The fundamental nature of this obligation [2] and the generally dim view taken by the common law toward any exemptions from this general obligation were well summarized by Dean

---

**1.** From the Parliamentary debate on the Bill to Indemnify Evidence reported in 12 T. Hansard, *Parliamentary History of England* 675, 693 (1812).

The Power to compel the attendance and the testimony of witnesses dates from the Statute of Elizabeth, 5 Eliz. 1, ch. 9, § 12 (1562). *See also Dobson v. Crew*, 78 Eng.Rep. 940 (1599). It was of this statutory duty that Sir Francis Bacon spoke in Countess of Shrewsbury's Trial, 2 How.St.Tr. 769, 778 (1612):

"You must know that all subjects, without distinction of degrees, owe to the king tribute and service, not only of their deed and hand, but of their knowledge and discovery.... [I]f they be called and examined, whether it be of their own fact or of another's, they ought to make direct answer."

**2.** This overriding duty to provide to the courts all available information was no respecter of class. As Jeremy Bentham initially hypothesized in 1827:

"Were the Prince of Wales, the Archbishop of Canterbury, and the Lord High Chancellor, to be passing by in the same coach while a chimney-sweeper and a barrow-woman were in dispute about a halfpennyworth of apples, and the chimney-sweeper or the barrow-woman were to think proper to call upon them for their evidence, could they refuse it? No, most certainly."

4 *The Works of Jeremy Bentham* 320 (Bowring ed. 1843). Dean Wigmore has pointed out, in 8 *Wigmore on Evidence* (McNaughton rev. 1961), at 71 n. 2, that Bentham's illustration came very nearly true in Rex v. Baines, 1 K.B. 258 (1909), where the Prime Minister and the Home Secretary were subpoenaed to testify as to a breach of the peace committed at a meeting where they were present, and also in Baccarat Trial (Gordon-Cumming v. Wilson), *Notable British Trials* Series 3, 75 (1891), where the plaintiff, suing for slander for having been falsely charged with cheating at cards, summoned and obtained

Wigmore in 8 *Wigmore on Evidence* (McNaughton rev. 1961), § 2192, "Duty to give testimony," at 70:

"For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving and that *any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.*" (Emphasis supplied).

### Testimonial Privileges Are Disfavored

Following from this general obligation to assist the search for truth with all available knowledge, the ancillary principle is also well settled that all of the various testimonial privileges,[3] as derogations from full and accurate fact finding, are looked upon with disfavor. Dean McCormick surveyed the landscape in his article *The Scope of Privilege in the Law of Evidence*, 16 Tex.L.Rev. 447 (1938), and observed, at 468, "The courts often say that privileges, since they curtail the truth from disclosure, should be strictly construed." He went on more fully, at 469:

the testimony of the Prince of Wales, who had taken part in the card game at a private home.

**3.** The family of testimonial privileges is an open-ended one. Some members are creatures of statute. Some trace their origins to the common law. One, the privilege against compelled testimonial self-incrimination, is constitutional in stature. A representative list of the other testimonial privileges would include such members as the husband/wife privilege, the attorney/client privilege, the doctor/patient and/or psychiatrist/patient privilege, and the priest/penitent privilege. Arguments are mounted periodically for the creation of an accountant/client privilege and a newspaperman/source privilege. The common denominator rationale is that the interest protected by the privilege will sometimes transcend the search for truth in the courtroom and, thereby, override the public's general entitlement to every man's evidence.

"The development of judge-made privileges halted a century ago. The manifest destiny of evidence law is a progressive lowering of the barriers to truth. Seeing this tendency, the commentators who take a wide view, whether from the bench, the bar, or the schools, seem generally to advocate a narrowing of the field of privilege."

He concluded, "One may hazard a guess ... that in a secular sense privileges are on the way out."

The United States Court of Appeals for the Second Circuit noted in *In Re Cueto*, 554 F.2d 14, 15 (2d Cir.1977):

"It is a fundamental rule of law that the public has a right to every person's evidence. There are a small number of constitutional, common-law and statutory exceptions to that general rule, but they have been neither 'lightly created nor expansively construed, for they are in derogation of the search for truth.' "

The same general approach to testimonial privileges was followed by the Supreme Court in *Branzburg v. Hayes, supra*, 408 U.S. at 690 n. 29, 92 S.Ct. at 2661 n. 29, "The creation of new testimonial privileges has been met with disfavor by commentators since such privileges obstruct the search for truth." *See also* Ladd, *Privileges*, 1969 Law & Soc. Ord. 555; *Falsone v. United States*, 205 F.2d 734 (5th Cir.1953).

■ Before concluding with the inimitable Dean Wigmore on the disfavored status of testimonial privileges, a brief word is in order as to why it is important for us to determine whether testimonial privileges are in favor or disfavor. In an otherwise close case for the application of a testimonial privilege, a case that could plausibly go either way, the "tilt" to be taken by the court is critically important. If testimonial privileges are determined to be in favor, our "tilt" toward finding the privilege applicable could well be decisive in that direction. If, on the other hand, testimonial privileges are determined to be in disfa-

vor, our "tilt" toward finding the privilege inapplicable could well be decisive in the other direction. When we're close to the line, which way should we lean?

We turn to the undisputed Master for guidance. Dean Wigmore has pointed out not only that these exceptions from the general duty are "to be discountenanced" and "should be recognized only within the narrowest limits" but also that, sometimes caught up in an apparently lofty purpose and losing their larger perspective, "judges and lawyers are apt to forget this exceptional nature." The appropriate attitude toward the testimonial privileges was unmistakably prescribed in 8 *Wigmore on Evidence* (McNaughton rev. 1961), § 2192, "Duty to give testimony," at 73:

> *"[A]ll privileges of exemption from this duty are exceptional,* and are therefore to be discountenanced. There must be good reason, plainly shown, for their existence. In the interest of developing scientifically the details of the various recognized privileges, judges and lawyers are apt to forget this exceptional nature. The presumption against their extension is not observed in spirit. The trend of the day is to expand them as if they were large and fundamental principles, worthy of pursuit into the remotest analogies. This attitude is an unwholesome one. The investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion, of these privileges. They should be recognized only within the narrowest limits required by principle. Every step beyond these limits helps to provide, without any real necessity, an obstacle to the administration of justice." (Emphasis in original).

Now knowing which way to "tilt," we look to the case at hand. As the issue approaches us, it has a "reverse English" on it. Paradoxically, it is the State arguing for an expansive view of the privilege against compelled testimonial self-incrimination and the appellant urging a stingier one.

### The Present Case

Charles Sneed, an inmate at the Maryland Penitentiary, was murdered in his cell at some time between 6 and 7 p.m. on Saturday, December 3, 1983. The immediate cause of death was strangulation, with a blunt injury to the abdomen as a contributory cause. The evidence showed indisuptably (the appellant, indeed, does not attack the legal sufficiency of the evidence) that the murderers were the appellant and his codefendant, Tyrone Little. Among the motives for the murder was robbery, although there were indications that some kind of grudge or grievance against the victim was also involved.

The appellant called Tyrone Little as a defense witness, notwithstanding notice through Little's attorney that Little would invoke the Fifth Amendment privilege. When Little was asked whether he knew the appellant, he invoked his privilege. Judge Pines declined to compel him to answer the question. After a subsequent extended discussion out of the presence of the jury, Judge Pines indicated that he would permit Little to assert his privilege if questioned as to any knowledge he had about Sneed's death, but would not uphold the privilege with respect to questions concerning Little's membership in the Moslem religious group. In his testimony before the jury, Little answered questions concerning his membership in the religious group but successfully asserted his privilege with respect to the death of Charles Sneed. He was then excused.

At the time Little was called to the stand by the appellant, Little had already been tried separately and had entered an *Alford* guilty plea to murder in the second degree. Upon that finding of guilty, he had also already been sentenced to a term of 25 years imprisonment, concurrent with the sentence he was already serving.

### The Issue

■ The issue is that of identifying the magic moment when incrimination becomes a *fait accompli*. Just as one

who is dead no longer runs the risk of being killed nor one pregnant, the risk of being impregnated, nor one blind, the risk of being blinded, one who has already been incriminated for an offense is past the point of no return in terms of the risk of incrimination.  At what point on the continuum is the process of incrimination sufficiently complete that the risk of incrimination is relegated to the past tense?  Though scattered cases deal cursorily with the problem, there is painfully skimpy analysis behind apparently uncritical holdings that seem either cavalier in their treatment of the subject or oblivious to the subtleties involved.

On the spectrum, several distinct time zones can be identified:

1) *Prior to verdict*—It is universally recognized that prior to the rendering of a verdict by the fact finder, the danger of incrimination still abides.  The privilege, therefore, continues to be available in full force.

2) *Through verdict but not through sentencing*—Some jurisdictions hold that the act of incrimination is complete with the rendering of the verdict of guilty and that the assessment of the appropriate penalty is simply not a part of the incrimination process.  The philosophical distinction is made between the adjudicatory stage and the punishment stage.  The imposing of the punishment, though part of the larger criminal justice process, is conceptualized as something distinct from the process of incrimination.  The imposing of the sanction for a perfected incrimination is not an inherent part of the incrimination process itself but only follows an incrimination that is already completed.  *Knox v. State*, 234 Md. 203, 198 A.2d 285 (1964); *People v. Fine*, 173 Misc. 1010, 19 N.Y.S.2d 275 (1940); *cf. Commonwealth v. Tracey*, 137 Pa.Super. 221, 8

A.2d 622 (1939); *State v. Knudtson*, 11 Idaho 524, 83 P. 226 (1905).[4]

Under this theory, the incrimination is completed at the instant the verdict of guilty is rendered and the privilege, therefore, ceases to have any justifying purpose at that very instant.

3) *Through sentencing*—Other jurisdictions hold that the risk of incrimination continues to run through the sentencing process. They reason that vulnerability to the sanction is an integral part of the incriminatory stage and that even a convicted defendant retains the privilege not to give testimony, in the sentencing forum or any other forum, that might serve to enhance the punishment. One of the leading cases espousing this position and one of the few cases nationwide that has given the entire problem the benefit of thoughtful analysis is the Court of Appeals decision in *Smith v. State*, 283 Md. 187, 388 A.2d 539 (1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979). *See also, e.g., Mills v. United States*, 281 F.2d 736 (4th Cir.1960); *Commonwealth v. Garland*, 475 Pa. 389, 380 A.2d 777 (1977); and *State v. Tyson*, 43 N.J. 411, 204 A.2d 864 (1964). Under this theory, the privilege continues to be operational through the sentencing stage.

A significant line of cases holds squarely, however, that once the sentencing is completed, incrimination in all of its manifestations is a *fait accompli* and the privilege thereby ceases to operate. *United States v. Gernie*, 252 F.2d 664 (2d Cir.1958); *United States v. Cioffi*, 242 F.2d 473 (2d Cir.1957); and *State v. Nelson*, 246 Or. 321, 424 P.2d 223 (1967).

---

**4.** Decisions such as *Commonwealth v. Tracey, supra,* and *State v. Knudtson, supra,* are blurred authority for the question of when incrimination is terminated in that the convictions in those cases were based upon pleas of guilty. The analyses wander back and forth ambiguously between the notion of termination of incrimination, whatever the modality of termination, and the very different notion of waiver of the privilege by virtue of the guilty pleas.

4) *Through direct appeal*—Some courts go further and hold that even following conviction and sentencing, there is a possibility of retrial following successful appeal and that the risk of incrimination, therefore, continues to be very real. They hold that the privilege is still available until such time as the initial incrimination has been affirmed through all possible stages of the direct appeal process. *Ottomano v. United States*, 468 F.2d 269 (1st Cir.1972); *Taylor v. Best*, 746 F.2d 220 (4th Cir.1984) (*dicta*); and *People v. Lopez*, 110 Cal.App.3d 1010, 168 Cal.Rptr. 378 (1980).

5) *Through the period of possible collateral review*—Although the argument is sometimes made that the possibility of retrial following successful collateral review is not significantly distinguishable from the possibility of retrial following successful direct review, few, if any, courts have been willing to deem so speculative and remote a risk of future incrimination to be adequate justification to continue the life of the privilege and deny the public the information to which it would otherwise be entitled. *See*, however, *Commonwealth v. Rodgers*, 472 Pa. 435, 372 A.2d 771 (1977) (Opinion for the Court by Roberts, J., concurred in on this point by one other justice out of seven sitting).

### The Maryland Divergence

The Fifth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights are parallel constitutional treatments of the same preexisting principle of English common law that *Nemo tenetur seipsum accusare*.[5] Historically, Maryland has always deemed the two constitutional provisions to be *in pari materia*, *Blum v. State*, 94 Md. 375, 51 A. 26 (1902); *Bass v. State*, 182 Md. 496, 35 A.2d 155 (1943), and held that they should receive a like construction. *Brown v. State*, 233 Md. 288,

---

**5.** No one shall be compelled to accuse himself.

196 A.2d 614 (1964); *State v. Panagoulis,* 253 Md. 699, 253 A.2d 877 (1969).

With respect to the moment when incrimination is completed and the privilege thereby ceases to exist, however, Maryland has interpreted its own Declaration of Rights one way and interpreted the Federal Fifth Amendment a very different way.

■ Under the Maryland Declaration of Rights, incrimination is fully completed when the verdict of guilty is rendered, either by way of trial or by accepting a plea of guilty, and the privilege ceases to exist. Judge Henderson announced this for the majority of the Court of Appeals in *Knox v. State,* 234 Md. 203, 198 A.2d 285 (1964). He clearly was dealing with the Maryland Constitution and not the Federal Constitution, as he pointed out, at 234 Md. 207, 198 A.2d 285, "For present purpose we may assume that the controlling constitutional provision is Article 22 of the Maryland Declaration of Rights, and not the Fifth Amendment to the Federal Constitution."

The Court of Appeals distinguished literal incrimination from placing one's self in an unfavorable posture at sentencing, "The claim in the instant case was not that Knox might be subjected to prosecution, for the crime about which he was asked to testify or any other crime, but simply that he might be put in an unfavorable position, as regards sentence...." *Id.* In holding squarely that with the rendering of the verdict of guilty the privilege ceased to exist, even prior to sentencing, the *raison d'etre* was "because the prosecution is over." *Id.* As Chief Judge Brune pointed out in his careful dissent, the holding in *Knox v. State* was not dependent upon the fact that the guilty verdict had come by way of a guilty plea but rested rather upon the termination of the risk of incrimination with the verdict itself, "The opinion of the court in the present case rests upon the fact of conviction as the basis for removing the privilege and seems to draw no distinction between a conviction resulting from a plea of guilty and one resulting

from a trial." *Id.* at 212–213, 198 A.2d 285 (Brune, C.J., dissenting).

*Smith v. State,* 283 Md. 187, 388 A.2d 539 (1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979), by way of contrast, dealt exclusively with the Court of Appeals' interpretation of the Federal Fifth Amendment and not with the Maryland Declaration of Rights. It did not purport to erode its earlier holding in *Knox v. State, supra,* in any respect, but simply distinguished it as a decision dealing with a different constitution. *"Knox* is inapposite for a more fundamental reason. As the Court made clear, that case did not involve a privilege arising under the Federal Constitution." 283 Md. at 189, 388 A.2d 539. In *Smith v. State, supra,* a witness had explicitly invoked the federal privilege. "[I]t is the Fifth Amendment privilege which Montgomery attempted to invoke. Thus, in determining the limits of Montgomery's privilege, the decisions under the Fifth Amendment are more pertinent." *Id.* at 190, 388 A.2d 539.

In rendering its interpretation of federal law on the subject of when the risk of incrimination is over and the privilege ceases, the Court of Appeals held squarely that a witness who has been convicted but not yet sentenced still runs an appreciable risk of incurring a heavier sentence and still possesses, therefore, the privilege. The *Smith v. State* decision relied primarily on the case of *Mills v. United States,* 281 F.2d 736 (4th Cir.1960). *Mills* also had extended the privilege to a witness caught in the time zone between verdict of guilty and sentencing. Although certain *dicta* in both *Mills* and *Smith* suggested that the availability of the privilege might continue even beyond sentencing, that issue was not before either court on the facts of the two cases.[6]

---

**6.** Indeed, *Smith v. State,* in its opening sentence, posed unequivocally the only issue before it:

"The issue in this criminal case is whether a non-party witness, who has pleaded guilty to a certain criminal charge but has not yet been sentenced, is entitled to invoke the Fifth Amendment privilege

Indeed, the holding of *Smith v. State* was clear "that the Fifth Amendment privilege against self-incrimination is available to one in the position of the witness Montgomery." 283 Md. at 191, 388 A.2d 539. It is equally clear that the position of the witness Montgomery was one between verdict and sentencing. The final conclusion of the Court of Appeals was based unequivocally upon that position, "[S]ince Montgomery at the time of Smith's trial had not been sentenced on his plea of guilty to possession of heroin, his testimony might have been considered in determining whether he would receive probation or be committed to an institution and, if the latter, in determining the length of such commitment." *Id.* at 195, 388 A.2d 539. Under those circumstances, under the Court of Appeals' interpretation of federal law, the privilege remains available.

The difference between the Maryland constitutional privilege and the federal constitutional privilege, as illustrated by the difference between *Knox v. State* and *Smith v. State,* is not material, however, to the decision before us. The witness Tyrone Little who was permitted to invoke the privilege to the alleged prejudice of the appellant was in the very different time zone between verdict-and-sentencing, on one hand, and the exhaustion of direct appeal, on the other. The appellant does not look to the Maryland Declaration of Rights, where he would find no solace under *Knox v. State,* but rather to the federal privilege under the Fifth Amendment. We turn, therefore, to federal law.[7]

### A False Beacon: Hoffman v. United States

If one is prudently to approach the interpretation of the Federal Constitution in this yet unsettled area, it is impor-

---

against self-incrimination and refuse to testify regarding that criminal charge."
283 Md. at 188, 388 A.2d 539.

**7.** Even though we are not looking at Maryland constitutional law, this is not to say that Knox v. State would not have at least some persuasive value, signalling Maryland's tilt on expansive versus restrictive interpretations, for whatever help that might be.

tant not to be beguiled or misled by a notoriously prominent false beacon: *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). For the lack of any other guidance by the Supreme Court, however, some of the decisions dealing with the issue before us have turned to *Hoffman* and focused upon a single sentence therein that is deceptively attractive. The *Hoffman* decision had absolutely nothing to do with the question of when incrimination is sufficiently terminated to vitiate the privilege. It did not remotely consider the issue. It dealt only with the substance of the compelled testimony: must the compelled testimony incriminate directly or is it enough that it have a tendency to incriminate? In the course of an extended discussion of that question, *Hoffman* uttered a single sentence that, lifted from context, might arguably be applied to the issue before us:

> "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."

341 U.S. at 486–487, 71 S.Ct. at 818–19. To do so, however, would be to compare apples with oranges. The facts of the *Hoffman* case and the fuller context in which the quoted sentence was uttered make it indisputably clear that the Supreme Court was dealing with a very different question. It was considering the *what* of incrimination and not the *when* of incrimination. The immediately preceding text (part of the same paragraph) made the subject matter of the discussion very clear:

> "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime.... But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer.... The witness is not exonerated

from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, . . . and to require him to answer if 'it clearly appears to the court that he is mistaken.' . . . However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." (Citations omitted).

*Id.* at 486, 71 S.Ct. at 818.

The discussion that followed, moreover, made the subject matter unequivocally clear. The compelled witness, before a special grand jury investigating the "rackets," had been publicly charged as being a known underworld character and he was a racketeer with a twenty-year police record. The Supreme Court made it very clear from all of the circumstances in the case it should have been obvious to a reasonable judge that sensitive areas were being inquired into that could well have implicated the witness in criminal activity himself. The witness need not incriminate himself to establish that his answer would be incriminating; a strong tendency is enough.

This is the sole context and exclusive subject matter of *Hoffman v. United States.*[8] It has no bearing upon the very different issue of when, upon the time line, incrimination is completed.

We proceed, properly wary of false lights on the shore.

### General Statements

The general statements of law explaining both the purpose of the privilege and the limitations upon its availability at least set the stage for more searching analysis. C.

---

8. Fully supportive of this reading of *Hoffman v. United States* is *Richardson v. State,* 285 Md. 261, 401 A.2d 1021 (1979).

McCormick, *Law of Evidence* (1st ed. 1954), § 135, "Termination of Liability to Punishment: Immunity Statutes," at 284, states:

> "If at the time of the claim of privilege, the liability of the witness to be convicted of the offense inquired about has been terminated, the danger against which the privilege is directed does not exist, and the claim of privilege fails. This is so when the witness has already been convicted or acquitted of the offense, when he has been pardoned, or when prosecution has been barred by the statute of limitations."

Dean Wigmore explains at 8 *Wigmore on Evidence* (McNaughton rev. 1961), § 2279, "Expurgation of criminality," at 481:

> "The law is concerned with its own penalties only. Legal criminality consists in liability to the law's punishment. When that liability is removed, criminality ceases; and with the criminality the privilege."

Dean Wigmore goes on, at § 2279(a), *loc. cit.*:

> "A *conviction* for the crime discharges all liability to the state and removes the possibility of further penalty; hence an act for which the person has been convicted no longer tends to incriminate, in the sense of the privilege. This is universally conceded." (Emphasis in original).

In *Reina v. United States*, 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960), the Supreme Court cites the above statement by Dean Wigmore as "weighty authority" for the proposition that:

> "[T]he ordinary rule is that once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime...."

364 U.S. at 513, 81 S.Ct. at 264.

In the course of a more general discussion in *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the Supreme Court observed, at 373 U.S. 188, 83 S.Ct. at 1155:

"In this case, the prosecutor initially did not believe that the Kahns could properly invoke their privilege against self-incrimination, reasoning with some justification that their plea of guilty to the gambling charge would erase any testimonial privileges as to that conduct. His view of the law was supported by substantial authority, *cf. Reina v. United States,* 364 U.S. 507, 513, 81 S.Ct. 260 [264], 5 L.Ed.2d 249, 255 . . . ."

The difficulty, however, with all of these general statements is that they take the termination of incrimination for granted and do not probe for the precise moment when that termination occurs.

### The Process of Incrimination Terminates with the Final Judgment of a Sentence

Accepting the interpretation of federal constitutional law in *Smith v. State, supra,* that exposure to incrimination continues even after the verdict has been rendered and until the sentence has been pronounced, we hold, by way of our further interpretation of federal constitutional law, that the risk of incrimination terminates at the moment the sentence is pronounced and the judgment thereby becomes final.

Support for this proposition is widespread. Even in his well-reasoned dissent from *Knox v. State, supra,* Chief Judge Brune, though urging that the risk of incrimination extended beyond the verdict stage, argued only for extending the risk to the time of sentencing:

"In my estimation, the answer to the question here should turn upon whether or not the defendant who has pleaded guilty is exposed to the risk of greater punishment by being required to testify with regard to the offense before sentence is imposed."

234 Md. at 211, 198 A.2d 285.

In *United States v. Romero,* 249 F.2d 371 (2d Cir.1957), Judge Lumbard was dealing with the case of a witness, a co-conspirator of the defendant, who had shortly before the trial in question been both convicted and sentenced. In

holding that the privilege was thereby no longer available, Judge Lumbard stated:

> "It is well established that once a witness has been convicted for the transactions in question, he is no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify."

*Id.* at 375.

Judge Lumbard relied upon the earlier Second Circuit opinion of *United States v. Cioffi*, 242 F.2d 473 (2d Cir.1957). There the witness in question had shortly before the defendant's trial been sentenced to ten years upon his plea of guilty. In holding that the privilege was no longer available, Chief Judge Clark stated:

> "Nor was it error to allow the Government to call Charles Jackson as a witness. Inasmuch as Jackson had already pleaded guilty to the indictment he had no obvious reason for invoking the privilege against self-crimination...."

*Id.* at 477.

In *United States v. Hoffman*, 385 F.2d 501 (7th Cir.1967), it was unclear whether the compelled witness, Fears, had yet been sentenced upon his plea of guilty or not, although the time lapse strongly suggests it. In holding that the privilege was no longer available, the court emphatically stated:

> "His conviction upon that plea divested him of his Fifth Amendment right to refuse to testify concerning the transactions and events involved and subjected him to being called by the government as a witness. It is well established that once a witness has been convicted for the transactions in question he is no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify."

*Id.* at 504.

One of the landmark cases, regularly referred to by all of the others, is *United States v. Gernie*, 252 F.2d 664 (2d Cir.1958). In holding that a government's witness who had

shortly before entered a plea of guilty was a compellable witness, bereft of the privilege, the Second Circuit stated:

> "Indeed the government had the right to compel Harrell to answer the questions as he had pleaded guilty and could not be further incriminated by answering where he had obtained the heroin."

*Id.* at 670.

Indeed, *Mills v. United States, supra,* relied upon so heavily by *Smith v. State, supra,* went to great pains to distinguish its situation from that in *Gernie.* Even though the fact may not have appeared in the *Gernie* opinion itself, the Fourth Circuit, in *Mills,* pointed out that the witness in *Gernie* "had been convicted . . . and sentenced."[9] Notwithstanding a single passing *dictum* in *Mills* to the effect that the risk of incrimination might continue through the appellate process, which *dictum* was seized upon by the *Smith v. State dictum,* the fundamental rationale for the *Mills* holding was that the witness in *Mills* remained in danger of incrimination precisely because she had not yet been sentenced:

> "The fact that Marjorie had not been sentenced distinguishes this case from *United States v. Gernie,* 2 Cir., 1958, 252 F.2d 664, 670, where the witness had been convicted of the crime with which charged and sentenced. It was held he no longer was able to claim the privilege of the Fifth Amendment and could be compelled to testify. The theory in that case was that, having been convicted and sentenced, the witness could not be further incriminated by his answers. However, at the time of these proceedings in the case at bar, the period within which

---

**9.** Indeed, *Smith v. State* took pains to emphasize that the witness status before it was akin to *Mills* (not yet sentenced) and unlike that in *Gernie* (already sentenced):

> "*Gernie,* however, like many other cases setting forth the same proposition, concerned a witness who had *both* pleaded guilty *and* been sentenced on the guilty plea. In the instant case, while the witness Montgomery had entered a plea of guilty, he had not yet been sentenced." (Emphasis in original).

283 Md. at 190, 388 A.2d 539.

Marjorie Mills could prosecute an appeal of her own conviction had not expired. Moreover, the District Court had indicated that it would, in fixing her sentence, consider any additional incriminating statements made by her." 281 F.2d at 741. *See also United States v. Heldt,* 668 F.2d 1238, 1253 (D.C.Cir.1981) ("It is established law that because a witness has been found guilty of the actions in question he is no longer entitled to claim the privilege of the fifth amendment with respect to those matters....").

Many of the state authorities are to the same effect. *State v. Tyson,* 43 N.J. 411, 204 A.2d 864, 867 (1964) ("We therefore hold that where a witness has pleaded guilty to a criminal charge but has not yet been sentenced, he retains his constitutional privilege to refuse to answer questions on the ground that his answers could incriminate him of that charge"); *State v. Nelson,* 246 Or. 321, 424 P.2d 223, 224 (1967) ("The courts are in agreement that the privilege against self-incrimination is waived where the witness has entered a plea of guilty and been sentenced and the examination is directed to eliciting facts concerning the crime of which he was convicted"); *People v. Smith,* 34 Mich.App. 205, 191 N.W.2d 392, 394–395 (1971) ("Although there is authority for the proposition that the privilege against self-incrimination is lost at the moment a plea of guilty is entered, it is our opinion that the privilege should not be deemed waived until the witness had been sentenced"); *Commonwealth v. Bellacchio,* 296 Pa.Super. 468, 442 A.2d 1147, 1150 (1982) ("A witness may invoke the privilege against self-incrimination if his conviction has not been finalized by the imposition of sentence"); *State v. McConnohie,* 121 Wis.2d 57, 358 N.W.2d 256 (1984); *Commonwealth v. Garland,* 475 Pa. 389, 380 A.2d 777 (1977); *Commonwealth v. Sanabria,* 478 Pa. 22, 385 A.2d 1292 (1978).[10]

---

**10.** *And see* Annot., *Plea of Guilty or Conviction as Resulting in Loss of Privilege Against Self-Incrimination as to Crime in Question,* 9 A.L.R.3d 990.

## A Raison d'Etre for the Rule

Although the overwhelming weight of federal authority and the preponderating weight of state authority in support of our conclusion is reassuring, it is not the sufficient condition for that conclusion. More important than precedential authority, there should be a rational principle logically explaining the conclusion we reach.

Of the five identifiable boundary markers that might designate the outer limit of reasonable risk, two can be summarily dismissed. The argument that the risk of incrimination terminates at some point prior to the rendering of a verdict is totally untenable. At the far end of the spectrum, the argument that the risk of incrimination continues through the remotest possibility of collateral review is equally untenable. Under that view, the risk of incrimination would never end and the privilege would never cease to exist until a sentence had been fully served and double jeopardy would operate as an independent bar.

The three remaining terminal points are: 1) the rendering of the verdict, 2) the passing of the sentence, and 3) the exhaustion of direct review.[11] Reasoned and neutral analysis points to the second of these as the logical termination point for the continuing and present risk of incrimination.

Notwithstanding *Knox v. State* to the contrary, we see no principled reason for deeming the risk of incrimination to cease at the moment of the rendering of the verdict rather than to continue through the moment of sentencing. Until the verdict is consummated by the sentence, there is no final judgment. We are still within the *nisi prius* stage. There yet is nothing on which an appeal can be taken. It

---

**11.** A further sub-distinction within the lines of direct review, that between review as a matter of right and discretionary review, has no compelling force of logic or reason behind it. *Cf. In re Bando,* 20 F.R.D. 610, 615 (1957), *rev'd on other grounds sub nom., United States v. Miranti,* 253 F.2d 135 (2d Cir.1958). Even more illogically, *People v. Lopez,* 110 Cal.App.3d 1010, 168 Cal.Rptr. 378 (1980), seems to look to the actual pendency of an appeal rather than to the time within which an appeal could still be taken.

strains logic to deem the risk of incrimination to be at an end before there has been a final judgment in the case.

Conversely, we think the reasons for deeming the risk of incrimination to end with the sentence and with, thereby, the recording of the final judgment are compelling. Those who argue for extending the life of the incriminatory risk through the exhaustion of direct review but not into the virtual immortality of collateral review frequently make the point that the chances of reversing a conviction are greater on direct review. This is far from always the case. When the convict's contention is that he received inadequate assistance of counsel, for instance, the chances of success are infinitely greater on a post-conviction petition than on a direct appeal. Both forms of review involve mere speculation as to the likelihood of success.[12] Indeed, the universal presumption is that the action of the trial court was correct and the burden is always upon the appellant or petitioner to overcome that presumptive validity.

In trying to conceptualize the very nature of the problem being grappled with, we believe a reference to the intimately related law of double jeopardy may lend helpful light. The notion of risk of incrimination and the notion of jeopardy are, if not literally identical, at least close analogs. The thing we are trying to measure—the threat of incrimination guarded against by the privilege—may helpfully be under-

---

**12.** In an opinion for the court in *Commonwealth v. Rodgers,* 472 Pa. 435, 372 A.2d 771 (1977), Justice Roberts (joined by only one other justice out of seven participating) suggested that whether there is reasonable risk of future incrimination should "properly [be] left to the sound discretion of the trial court," 372 A.2d at 781, which would ascertain the reasonableness of that risk by assessing the likelihood of success upon review (in that case, upon collateral review). The fact that no other court has ever taken this bizarre position reflects the incapacity of the trial judge, with neither appellate briefs nor trial record before him, to make such an assessment. The trial judge would have to conduct a mini-appellate hearing or mini-collateral review in order to make such a prediction of likely success. Short of that, the discretion of the trial judge would be unfettered. Those judges who smile upon the privilege could always extend it; those who frown upon it could always withhold it.

stood as the initial jeopardy. That jeopardy continues through the passing of the sentence.

Beyond that point, whether the modality of reversal be direct or collateral, what is involved is no longer initial jeopardy but the mere possibility that a case might be sent back for a new and subsequent jeopardy. The likelihood of rebutting the presumptive validity of the initial judgment, directly or collaterally, is never strong and is, at best, speculative.[13]

We believe that the mere remote possibility that a second jeopardy might come about is beyond the contemplated pale of the constitutional privilege. We believe that the only principled and neutral boundary marker that can be established is that between final judgment and subsequent review, that between adjudication on the factual merits and posterior monitoring for trial error, that between the posture of a defendant who is presumptively innocent and the posture of a convict who is presumptively guilty, that between actual present jeopardy and the mere possibility of subsequent second jeopardy. That is the logical termination point for the reasonable and likely risk of incrimination. That is the moment when the incrimination has passed into the past tense. That is the moment when the only future tense remaining is in the subjunctive mood.

\* \* \* \* \* \*

---

**13.** We agree with the observation made in *In re Bando,* 20 F.R.D. 610, 618 (1957), *rev'd on other grounds sub nom., United States v. Miranti,* 253 F.2d 135 (2d Cir.1958):

"The mere fact that a witness may have counsel imaginative enough to conceive of some remote and unsubstantial danger of incrimination is not enough to justify a claim of the privilege. If that were the situation, the law would never be able to compel any witness to answer any questions."

Equally pertinent are the words from *Brown v. Walker,* 161 U.S. 591, 600, 16 S.Ct. 644, 648, 40 L.Ed. 819 (1896):

"[I]t would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice."

As to this aspect of his contention, therefore, we conclude that the appellant is absolutely right. If this had been the only reason the trial judge had for ruling that the appellant was not entitled to compel the testimony of the proposed defense witness Tyrone Little, reversible error would have been committed and the appellant would be entitled to a new trial. Such, however, was not the case. The appellant wins the battle, but not the war.

### *The Alternative Rationale*

■ Judge Pines also concluded, as a reason for ruling against the appellant, that Tyrone Little still ran a real risk of incrimination, if compelled to testify, because he might be revealing his complicity in other crimes not yet charged. Easily foreseeable, as Judge Pines explicitly pointed out, was the possibility that the State could charge him with conspiracy to murder Charles Sneed. *United States v. Miranti,* 253 F.2d 135 (2d Cir.1958); *United States v. Johnson,* 488 F.2d 1206 (1st Cir.1973). There was also a real possibility that the testimony would have revealed the existence of an unlawful homosexual relationship between the witness Little and the appellant, with a variety of criminal charges possibly stemming therefrom. *Commonwealth v. Carrera,* 424 Pa. 551, 227 A.2d 627 (1967). The mere possibility of such other charges is enough to establish the risk of incrimination and the entitlement to the privilege. *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Royal v. State,* 236 Md. 443, 448, 204 A.2d 500 (1964). On the basis of this alternative rationale, we affirm the ruling of the trial court. *Thomas v. State,* 63 Md.App. 337, 492 A.2d 939 (1985).[14]

The appellant's remaining contentions will not detain us long.

---

**14.** The appellant's alternative sub-contention that he was entitled to introduce Little's grand jury testimony if Little was, by virtue of the privilege, unavailable as a live witness was not preserved for appellate review. *Funkhouser v. State,* 51 Md.App. 16, 24, 440 A.2d 1114 (1982). *And see Fowler v. Benton,* 229 Md. 571, 575, 185 A.2d 344 (1962).

*The Suppression of the Appellant's Statement*

The appellant claims that a written statement given by him to Lawrence Carpenter, the Chief of Security at the Maryland Penitentiary, and to Detective Segreti was involuntary in that it was the product of an improper inducement under *Hillard v. State,* 286 Md. 145, 153,. 406 A.2d 415 (1979). The contention is without merit for two separate reasons.

■ Initially, we see no improper inducement. In the course of an interrogation already legitimately in progress, in full compliance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the following exchange between Detective Segreti and the appellant took place:

"Detective: The man was beaten up. As it stands, you are going to be charged with it. The only chance you stand is to tell me who was with you. It's up to you.

Ellison: I don't know nothing about it.

Detective: It's no big deal to me. If you didn't hurt the man, don't take it for somebody else, but you were in his cell yesterday.

Ellison: No, I wasn't in there. ᵘ

Detective: How come two people picked you out?

Ellison: I don't know. I can't answer that. I don't know nothing, ain't nothing I can say."

This is by no means the functional equivalent of the police officer's improper inducement in *Hillard,* whereby he promised to "go to bat" for the defendant if he confessed. The situation here is far closer to the situations in *Merchant v. State,* 217 Md. 61, 141 A.2d 487 (1958), in which the officer's statement that "the truth hurts no one" was not construed to be a promise of leniency; *Ralph v. State,* 226 Md. 480, 174 A.2d 163 (1961), *cert. denied,* 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962), in which the officer's comment that it "would be better if he told the truth" was not deemed to constitute an improper inducement; and *Finke v. State,* 56 Md.App. 450, 468 A.2d 353 (1983), in which the officer's

promise to investigate any leads concerning the crime was not held to be an improper inducement.

It was obvious, moreover, that the appellant was not induced to do anything to his disadvantage; the statement given was fully exculpatory and not remotely inculpatory. His claim of oblique entanglement by admitting the ownership of a green jacket found in the victim's cell has reference to an admission he made immediately after receiving his *Miranda* warnings and long before the ostensible "inducement" occurred. In dealing with admissions even further along the exculpatory-inculpatory spectrum, the Court of Appeals noted in *Stewart v. State*, 232 Md. 318, 324, 193 A.2d 40 (1963), that "the less incriminating the admission, the less the likelihood that it was obtained by coercion or inducement." Here, the admission was not incriminating at all.

Trimmed to the bone, the appellant is objecting to the admission of the following self-serving declarations, "I don't know nothing about it ... No, I wasn't in there ... I don't know. I can't answer that. I don't know nothing, ain't nothing I can say." Having failed to clear the first barrier, the appellant is mercifully spared the hurdle of demonstrating what prejudice he thereby suffered.

### The Multitudinous Motions for Mistrial

On the subject of his numerous motions for mistrial, the appellant, apparently in the eyes of the trial judge and most definitely in our eyes, placed himself in the legendary disadvantage of "the boy who cried, 'Wolf!'" At the trial level, the humdrum repetition of the motion and its attendant denial became almost a matter of conditioned reflex. Before us, there is a "scattershot" contention in this regard that is devoid even of credibility, let alone merit. The seven pages of the appellant's brief devoted to this contention constitute a rambling tale of woe. They contain a lengthy catalog of bald allegations of various prosecutorial sins, derelictions, and misprisions "which were the subject of numerous motions for mistrial." How many such motions

there were, we are left to speculate. We are furnished with "a partial listing of those instances where the prosecutor delivered 'foul blows' calculated to improperly obtain a conviction." Even after listing seven instances where motions for mistrial were made and denied, without significant analysis or argument and without any citation of authority with respect to any of them, the appellant concludes that "the foregoing does not present an exhaustive list of every instance in which the prosecutor attempted, sometimes artfully and sometimes with a bludgeon, to play to the jury." We obviously are not going to burrow through a record to dig up other such nuggets which the appellant himself has not bothered to unearth.

The general insubstantiality of any of these bald allegations is reflected by the third of them. It recites that appellant's counsel himself asked a question which was objected to, the objection being sustained; that both counsel were requested to approach the bench; and that at the bench, the prosecutor stated, "I can't believe you asked that." Apparently insulted by the prosecutor, the appellant resorted to his standard response of moving for a mistrial. What conceivable impact the wounded feelings of the appellant's lawyer could have had upon the course of the trial, so as to compel a mistrial, is not suggested.

Nor does the jeremiad pause to consider the issue of non-preservation. While characterizing the rebuttal argument of the prosecutor as "replete with personal attacks upon counsel for appellant," the contention notes that "some of which, because of the very number of the comments, were unobjected to." At another point, the contention observes, "Although unobjected to, such comments were clearly improper." Why our attention is directed to things which are not preserved for our review is not made clear.

It is enough to note, as a general proposition, that the decision to grant a mistrial is left to the wide discretion of the trial judge and that we may not and will not interfere

with the exercise of that discretion absent a showing of clear abuse. The unfocused fusillade loosed upon us here does not persuade us of any such clear abuse.

### The Withdrawal of the Motion for Judgment of Acquittal

■ At the close of the State's case, the appellant moved for a judgment of acquittal, which was denied. He "thereafter raised as part of the same motion, the motion previously made to strike the State's election to seek the death penalty." Without even considering the bizarre substance of the claim,[15] the appellant urged this upon the court as part of his motion for a judgment of acquittal at the end of the State's case under Maryland Rule 4–324(a). Notwithstanding the fact that at the end of the entire case, the appellant again made both a motion for judgment of acquittal and a motion "to strike the State's election to seek the death penalty," those subsequent motions are not before us. In the appellant's table of contents, repeated in his listing of "Questions Presented" and repeated again as his fourth legal argument, the contention is unequivocally framed:

"The trial court erred in denying appellant's motion to strike the State's election to seek the death penalty *at the close of the State's case.*" (Emphasis supplied by us).

Our concern is not with the contention the appellant might have made nor even with the contention the appellant may

---

**15.** The claim seems to be that notwithstanding the State's election to seek the death penalty at the outset of the trial and notwithstanding the appellant's failure to object thereto, if the evidence, either at the end of the State's case or at the end of the entire case, is not sufficient to support a finding that the appellant was a principal in the first degree so as to be eligible for the death penalty, then the judge should declare a mistrial and start all over again with a jury that is not "death-qualified" and not, therefore, more prone to convict. Above and beyond the innumerable procedural flaws in the appellant's argument, it flies directly in the face of the recently announced decisions of the Court of Appeals in *Foster v. State*, 304 Md. 439, 499 A.2d 1236 (1985) and *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985).

have thought he did make but only with the contention actually made.

Following the denial of the motion, the appellant put on his case. Rule 4–324(c) unambiguously provides:

"A defendant who moves for judgment of acquittal at the close of evidence offered by the State may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. *In so doing, the defendant withdraws the motion.*" (Emphasis supplied).

■ It is as clear as the English language can ever make a matter clear that the motion now urged upon us was withdrawn by the appellant himself when he offered evidence in his own behalf. The motion is no longer in the case and there is nothing for us to consider. *Winkles v. State,* 40 Md.App. 616, 392 A.2d 1173 (1978); *Williams v. State,* 19 Md.App. 204, 310 A.2d 593 (1973); *Martin v. State,* 10 Md.App. 274, 269 A.2d 182 (1970); *Richardson v. State,* 6 Md.App. 448, 251 A.2d 924 (1969).

### *Afterthoughts on Jury Instructions*

■ The appellant takes umbrage at the instruction wherein Judge Pines explained to the jury that they "may consider the multiple injuries and their intensity" as "providing adequate evidence of premeditation." Although the appellant now objects to this instruction in terms of its legal correctness, his only objection at the trial was that the facts were not adequate to support the instruction. Giving him the benefit of the doubt on the preservation issue, we simply note that the instruction is an accurate statement of law. *Kier v. State,* 216 Md. 513, 140 A.2d 896 (1958); *Hounshell v. State,* 61 Md.App. 364, 486 A.2d 789 (1985); *Fuller v. State,* 45 Md.App. 414, 418, 413 A.2d 277 (1980).

■ The appellant's second afterthought is that the trial judge instructed the jury only with respect to robbery, first-degree felony-murder, and first-degree premeditated murder. Although the appellant now objects to the failure

to have invited the jury to compromise at some lower plateau of guilt, *but see Booth v. State,* 62 Md.App. 26, 488 A.2d 195 (1985), the appellant utterly failed to lodge any objection at the time the instructions were given. Md. Rule 4–325(e). The appellant, in fact, expressly consented to the verdict sheet. In commenting briefly upon our disinclination to "pull the appellant's chestnuts out of the fire" under the "plain error" departure from the normal rules of procedure, it is enough to note that our fundamental sense of justice is not outraged by the failure of the jury to reach an utterly illogical compromise verdict.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.